# EXHIBIT 5

Ground Lease No. B-206

EXHIBIT 5

# GROUND LEASE

WASHOE DEVELOPMENT ENTERPRISE

TO

CARSON VALLEY/TAHOE SELF-STORAGE, L.L.C,
A LIMITED LIABILITY COMPANY

PLYMOUTH ROAD #1

AUGUST 28 , 1996

672-001-97

# TABLE OF CONTENTS


| | | Page No. |
|---|---|---|
| ARTICLE I | | |
| Demise of Leased Land | | 1 |
| 1.01 | Leased Land | 1 |
| ARTICLE II | | |
| Lease Term | | 2 |
| 2.01 | Fixed Commencement and Expiration Dates | 2 |
| 2.02 | Lessee's Option to Extend | 2 |
| 2.03 | Lessor's Option to Purchase | 4 |
| 2.04 | Lessor's Obligation to Purchase | 7 |
| ARTICLE III | | |
| Consideration and Rent | | 8 |
| 3.01 | Consideration | 8 |
| 3.02 | Monthly Rent | 8 |
| 3.03 | Percentage Rent | 10 |
| 3.04 | Books and Records | 11 |
| 3.05 | Net Lease | 12 |
| 3.06 | Covenant to Operate | 13 |
| ARTICLE IV | | |
| Use of Premises | | 14 |
| 4.01 | Primary Use | 14 |
| 4.02 | Signs | 14 |
| ARTICLE V | | |
| Construction by Lessee | | 15 |
| 5.01 | Lessee's Right to Build -- General Conditions | 15 |
| 5.02 | Approvals | 16 |
| 5.03 | Building to be Within Demised Premises | 17 |
| 5.04 | Due Diligence | 17 |
| 5.05 | Prerequisites to the Start of Construction | 18 |
| 5.06 | Lessee's Ownership of Improvements and Fixtures | 22 |
| 5.07 | Right to Cancel | 23 |


672-001-97

ARTICLE VI
Taxes . . . . . . . . . 24
6.01 Real Property Improvements . . . 24
6.02 Personal Property . . . . . 25

ARTICLE VII
Insurance to be Maintained by Lessee . . . 25
7.01 Hazard Insurance . . . . . 25
7.02 Liability Insurance . . . . 26
7.03 Workmen's Compensation Insurance . . 27
7.04 Deposit of Policies . . . . 28
7.05 Consent to Blanket Insurance Policy . 29
7.06 Increased Level of Fire Insurance . . 30
7.07 Indemnification . . . . . 32

ARTICLE VIII
Condemnation of the Property . . . . . 34
8.01 Division of Proceeds . . . . 34
8.02 Partial Taking . . . . . 35
8.03 Controversies to be Resolved
by Arbitration . . . . . 37
8.04 Temporary Taking . . . . . 37

ARTICLE IX
Damage or Destruction of Improvements . . . 38
9.01 Lessee's Absolute Duty to Repair . . 38
9.02 No abatement of Rent . . . . 39

ARTICLE X
Disbursement of Insurance Proceeds and Other Funds
by Leasehold Mortgagee or Other Depository . . 39
10.01 Depository . . . . . . 39
10.02 Disbursement in Stage Payments . . 40
10.03 Depository's Fees and Expenses . . 42
10.04 Nonliability of Depository . . . 42

ARTICLE XI
Changes and Alterations by Lessee . . . . 42
11.01 Conditions to be Observed by Lessee . 42
11.02 Lessee to Secure all Necessary Approvals 43
11.03 Work to be Supervised by Architect
or Engineer, Lessor's Approval . . 43
11.04 Value and Utility of Improvements
Not to be Impaired . . . . 44

672-001-97

11.05 Work to be Done in Workmanlike Manner; Insurance . . . . . . 44
11.06 Bonds Required . . . . . . 45
11.07 Rent Deposit . . . . . . . 46

ARTICLE XII
Assignment, Subletting and Mortgaging . . . 48
12.01 Assignment by Lessee . . . . . 48
12.02 Subletting by Lessee . . . . . 49

ARTICLE XIII
Use of the Premises . . . . . . . 51
13.01 Limits on Use . . . . . . 51
13.02 Indemnity for Violation of Law . . 52

ARTICLE XIV
Default and Remedies . . . . . . 53
14.01 Events of Default . . . . . 53
14.02 Notice as Precondition to Lessor's Remedies . . . . . . 55
14.03 Lessee's Right to Cure Defaults . . 56
14.04 Rights of Subtenants; Nondisturbance Clause . . . . . . . 56
14.05 Lessor's Remedies . . . . . 57

ARTICLE XV
Surrender and Removal . . . . . . . 62
15.01 Surrender of Possession . . . 62
15.02 Lessee's Quitclaim . . . . . 62

ARTICLE XVI
Lessor's General Protective Provisions . . . 63
16.01 Lessor's Right of Entry and Inspection 63
16.02 Lessor's Right to Cure Default . . 63
16.03 Accord and Satisfaction . . . 64
16.04 Transfer by Lessor -- Release From Liability . . . . . . 64
16.05 Reservation of Minerals . . . 65

ARTICLE XVII
General Provisions . . . . . . . . 66
17.01 Conditions and Covenants . . . 66
17.02 Waiver of Breach . . . . . . 66
17.03 Time of the Essence . . . . 67
17.04 Computation of Time . . . . 67


672-001-97

17.05 Unavoidable Delay -- Force Majeure . 67
17.06 Successors in Interest . . . . 68
17.07 Entire Agreement . . . . . 68
17.08 Partial Invalidity . . . . 69
17.09 Relationship of Parties . . . 69
17.10 Interpretation and Definitions . . 69
17.11 Attorney's Fees . . . . . . 73
17.12 Interest . . . . . . . 73
17.13 Modification . . . . . . 73
17.14 Delivery of Rent and Notices -- Method and Time . . . . . 73
17.15 Federal Trust Responsibility . . 75
17.16 Lessor's Assistance to Lessee's Operations . . . . . . 75
17.17 Employment of Tribal Members . . 76
17.18 Tax Benefits for Operating on Tribal Lands . . . . . . . 76

ARTICLE XVIII
Arbitration . . . . . . . . 77
18.01 American Arbitration Association . . 77

ARTICLE XIX
Execution, Recording and Incorporation by Reference 78
19.01 Recording . . . . . . 78
19.02 Counterparts . . . . . . 79
19.03 Execution . . . . . . . 79

Lease Approval Pursuant to 25 CFR, Part 162 . . . 80

EXHIBIT A . . . . . . . . . . 81

EXHIBIT B . . . . . . . . . . 82

EXHIBIT C . . . . . . . . . . 83

EXHIBIT D . . . . . . . . . . 84

EXHIBIT E . . . . . . . . . . 85

EXHIBIT F . . . . . . . . . . 86

672-001-97

# GROUND LEASE

**THIS GROUND LEASE**, hereinafter referred to as "Lease", is made and entered into this 18th day of December, 1996, by and between the THE WASHOE DEVELOPMENT ENTERPRISE, hereinafter referred to as "Lessor", and CARSON VALLEY/TAHOE SELF-STORAGE, L.L.C., a Limited Liability Company, of Stateline, Nevada, hereinafter referred to as "Lessee", in accordance with the provisions of Title 25, Code of Federal Regulations, Part 162, and with the approval of the Secretary of the United States Department of the Interior, hereinafter referred to as "Secretary", or his authorized representative acting under delegated authority, for the purpose of granting to Lessee long-term leasehold rights for the construction of, and operation of, a facility consisting of individual units for rent to the public for the purpose of storing personal property, hereinafter referred to as a "self-storage" unit.

672-001-97

## ARTICLE I

## DEMISE OF LEASED LAND

1.01: Leased Land

Lessor, for and in consideration of the rents, covenants, and conditions herein contained to be kept, performed, and observed by Lessee, does lease and demise to Lessee, subject to all matters of



Michelsen Construction Company
Plymouth Road #1
August 28, 1996, Rev. #5

record, and Lessee does rent and accept from Lessor, that certain tract of tribal land, held in trust for the Washoe Tribe of Nevada and California by the United States Department of Interior, Bureau of Indian Affairs, located in the County of Douglas, State of Nevada, more particularly described in Exhibit "A," attached hereto and by this reference incorporated herein for exclusive use of Lessee. Said real property is hereinafter referred to from time to time as "Plymouth Road #1", "Premises," "Demised Premises," or "Leased Land."

ARTICLE II

LEASE TERM

2.01: Fixed Commencement and Expiration Dates

This Lease shall be for a term of twenty (20) years, referred to as "Lease Term," commencing on the 18th day of December, 1996, and expiring on the 17th of Dec., 2016.

2.02: Lessee's Option to Extend

Lessee may, at Lessee's option, extend the original term of this Lease for one additional period of fifteen (15) years, subject to all provisions of this Lease, including but not limited to provisions for adjustments to and variations in rent. Lessee may, at Lessee's election, assign this option at any time and from time

672-001-97

to time to any one or more leasehold mortgagees permitted by this Lease, and may give any such mortgagee, with or without such assignment, power of attorney to exercise such option. After exercise of the option to extend, all references to the term shall be considered to mean the term as extended, and all references to termination or to the end of the term shall be considered to mean the termination or end of the term as extended. Lessee's right to the option is subject to:

1. The following conditions precedent:

a. The Lease shall be in effect at the time notice of exercise is given and on the last day of the term.

b. Lessee shall not be in default under any provision of this Lease at the time notice of exercise is given or on the last day of the term.

2. Compliance with the following procedure for exercising the option:

a. At least thirty (30) days before the last day of the term, Lessee shall give Lessor notice in writing irrevocably exercising the option.

b. In lieu of executing a new lease, each party shall, at the request of the other, endorse on the original Lease

672-001-97

or on a true copy thereof that party's signature or signatures, the date the option was exercised, and the words "option exercised." Alternatively, each party shall, at the request of the other, execute a memorandum, in recordable form, acknowledging the fact that the option has been exercised and otherwise complying with the requirements of law for an effective memorandum or abstract of lease.

2.03: <u>Lessor's Option to Purchase</u>

Lessor may, at Lessor's option, purchase from Lessee, or its assigns, all buildings, fixtures, and other improvements located on the Premises, together with any inventory, machinery, equipment, furniture, supplies and all other tangible personal property used in connection with, or for the operation of, the self-storage facility which is intended to be built on the Premises, along with all accounts receivable, contracts, agreements, and other intangible property, including trade names and good will, in addition to any debts, liabilities or obligations, contingent or otherwise, of the self-storage business intended to be developed on the Premises, subject to compliance with the following procedures:

1. At least ninety (90) days before but no more than one hundred eighty (180) days before the expiration of the twentieth

672-001-97

(20th) year of the original term of the Lease, or at least ninety (90) days but no more than one hundred eighty (180) days before the expiration of any fifth (5th) year thereafter, whether during the original term or any extension thereof, which periods shall be known as Lessor's option periods, Lessor shall give Lessee, or its assigns, notice in writing of Lessor's intention to consider purchasing the assets and liabilities of the subject business.

2. Within thirty (30) days after serving of its notice to consider purchasing the assets and liabilities of the subject business, the Lessor and the Lessee shall each separately designate an appraiser who shall together jointly designate a third appraiser. The failure of either the Lessor or Lessee to appoint an appraiser within the time allowed shall be deemed equivalent to appointing the appraiser appointed by the other party. If, within sixty (60) days after the appointment of all appraisers, a majority of appraisers concur on the value of the business, that appraisal shall be binding and conclusive. If a majority of the appraisers do not concur within that period, the determination of the appraiser whose appraisal is neither highest nor lowest shall be binding and conclusive. The Lessor shall bear the expense of all appraisers. The agreed upon basis evaluation shall be the direct

672-001-97

capitalization method based upon the stream of expected net income from the property calculated on the last three years' stabilized expense and income statements less the concurrent appraised value of the Tribal lands. Payments made by the Lessee to the Lessor under this Lease shall not be included in the list of stabilized expenses for determining the stream of expected net income.

3. Lessee shall assist all such appraisers fully and completely in their efforts to evaluate the business, including but not limited to, granting full and complete access to any and all facilities, records, accounts and programs incidental to common practices for evaluation in the area. Upon completion of the appraisals, Lessor shall present Lessee with complete copies of all three appraisal reports.

4. Should Lessor desire to purchase the subject business opportunity, Lessor shall notify Lessee of its intention to exercise its option by delivering to Lessee, within thirty (30) days of the date of submission to Lessor of the appraisal report, unless the parties agree to a later date, the full purchase price. In the alternative, Lessor may tender to Lessee an amount equal to thirty (30) percent of the purchase price with a properly executed promissory note in the same form as Exhibit B secured by the assets

672-001-97

of the business and evidencing the following terms: the balance owing in monthly installments of both principal and interest amortized over a period of fifteen (15) years, with interest calculated on an adjustable rate basis equal to the prime rate (as determined by the Bank of American NT&SA-San Francisco) plus two percent (2%), but in no event shall the interest rate be lower than seven percent (7%) per annum or greater than twelve percent (12%) per annum. Notwithstanding the amortization, the principal balance shall be all due and payable in ten (10) years. There shall be no prepayment penalty.

6. Upon tender by Lessor of full payment of the purchase price, Lessee shall execute and deliver all documents necessary to convey to Lessor all right, title and interest in and to the assets of the subject business opportunity free of all encumbrances and the rights and responsibilities of Lessee, or its assigns, under the terms of this Lease, shall terminate.

672-001-97

2.04: <u>Lessor's Obligation to Purchase</u>

Upon expiration of this Lease, or any extension thereof, in order to compensate Lessee for the value of improvements made upon Lessor's property, and in consideration to Lessor for allowing Lessee's business to operate on Lessor's land during the period of

the Lease, Lessor shall purchase from Lessee the then existing business opportunity on the Leased Premises, including improvements placed on the Leased Premises by Lessee, for a price to be determined by, and in a manner consistent with §2.03 above.

ARTICLE III

CONSIDERATION AND RENT

3.01: Consideration

Upon execution of this Lease, Lessee agrees to pay Five Thousand Dollars ($5,000.00) as full and complete consideration to Lessor for any and all development fees, inspections and services of Lessor's Planning Department.

3.02: Monthly Rent

Lessee covenants and agrees to pay to Lessor the sum of Six Thousand Dollars ($6,000.00) upon the execution of this Lease by all parties, which sum shall serve as rental payment for the first nine (9) months of the term of this Lease. As of the first day of the tenth (10th) month of the term of this Lease, Lessee shall pay monthly to Lessor the sum of One Thousand Five Hundred Dollars ($1,500.00), or an amount equal to seven percent (7%) of the gross revenue of the business opportunity situated on the Premises, whichever is greater, as and for rent of the Premises. Beginning

672-001-97

on the first day of the first month of the fifth (5th) year of the term of this Lease, Lessee shall pay monthly to Lessor the sum of One Thousand Seven Hundred Dollars ($1,700.00), or an amount equal to eight percent (8%) of the gross revenue of the business opportunity situated on the Premises, whichever is greater, as and for rent of the Premises. Beginning on the first day of the first month of the tenth (10th) year of the term of this Lease, Lessee shall pay monthly to Lessor the sum of One Thousand Nine Hundred Dollars ($1,900.00), or an amount equal to ten percent (10%) of the gross revenue of the business opportunity situated on the Premises, whichever is greater, as and for rent of the Premises. Beginning on the first day of the first month of the fifteenth (15th) year of the term of this Lease, Lessee shall pay monthly to Lessor the sum of Two Thousand One Hundred Dollars ($2,100.00), or an amount equal to ten percent (10%) of the gross revenue of the business opportunity situated on the Premises, whichever is greater, for the remainder of the term of this Lease, as and for rent of the Premises. At the expiration of the term of this Lease, should Lessee exercise its option to renew this Lease for an additional period of time, the parties hereby agree to exercise good faith efforts to negotiate new rental rates for the extended period of

672-0017-97

this Lease. All monthly rental payments required herein shall be paid in full no later than the tenth (10th) day of the month each such payment is due, without any set-off or deduction by Lessee whatsoever, or Lessor may pursue any and all remedies available pursuant to Article XIV herein.

3.03: <u>Percentage Rent</u>

Within fifteen (15) days after the expiration of each lease month, as hereinafter defined, Lessee shall furnish to Lessor a statement, attested to as to accuracy by the agent of Lessee who prepares the statement, setting forth the gross revenues received in or from the Demised Premises during the previous lease month, and contemporaneously with the rendition of such statement, Lessee covenants to pay to Lessor the amount by which the percentage rental due for the previous lease month exceeds the monthly rental payment actually paid by Lessee for that Lease month. The expression "Lease month" shall have the meaning ascribed to it in this paragraph, namely; the first Lease month begins on the day the self-storage facility contemplated herein opens for business nine (9) months after execution of this lease and ends on the last day of that month. Each successive month thereafter shall be deemed a separate Lease month. If there be a period at the end of the term

672-001-697

of this Lease (whether or not such end of the term of this Lease is due to an earlier termination of this Lease in accordance with the terms thereof) which is less than a full month, then such shorter period shall be considered a separate lease month for percentage rent purposes. The minimum monthly rent shall be prorated.

3.04: Books and Records

Lessee covenants that there will be kept in respect to the business transacted in or from the Demised Premises, such books and records as may be necessary to show in detail all receipts of Lessee realized from the Demised Premises, and that said books and records will be preserved for not less than three (3) years after the close of the calendar year for which they are kept. Lessee further agrees that such books and records will in any event adhere to generally accepted accounting principles consistently applied. It is further agreed that Lessor shall have the right to examine during regular business hours at the main accounting office of Lessee, all books and records of Lessee in any way pertaining to business transacted in or from the Demised Premises. Lessee represents that its main accounting office will be kept at:

219 Kingsbury Grade
P. O. Box 2010
Stateline, NV 89449

672-001-97

and that the books and records aforesaid will be kept and maintained at said office; and Lessee agrees to notify Lessor if said books or records are to be kept in any other place. If, upon any examination by Lessor of the books or records of Lessee, any error should be revealed in favor of Lessor which results in there being due to Lessor additional percentage rental in the amount of One Thousand Dollars ($1,000.00) or more, then the reasonable cost of such an examination shall be paid by Lessee to Lessor.

The terms "stabilized expense(s)" or "stabilized operating expense(s)" as used in Section 2.03 and elsewhere in this Lease shall be computed in accordance with Exhibit C hereto and incorporated herein by reference.

3.05: <u>Net Lease</u>

It is the intention hereof that the Lessor shall, except as hereafter noted, receive the monthly rental, the percentage rental, and any other charges due hereunder free from all charges, expenses, costs and deductions of every description.

Notwithstanding the foregoing it is specifically understood that Lessee shall not be liable for any real property taxes, assessments or other charges from any governmental agency including but not limited to Douglas County, Nevada. Lessee shall be subject

672-001-97

to real and personal property taxes assessed by the Washoe Tribe or its affiliates; however, Lessee shall be entitled to a credit against rents due and owing hereunder in the amount of any such tax paid. In no event shall Lessee be liable for tax installments or lump sum payments in any amount in excess of the rent payable hereunder on a monthly basis.

3.06: <u>Covenant to Operate</u>

As one of the inducements for the making of this Lease, Lessee hereby agrees, during the full term hereof (except as may be otherwise expressly provided for herein), to conduct the business of operating self-storage facilities on the Leased Lands and to keep said self-storage facilities open daily for the regular conduct of its business herein during the same hours at least as are customarily employed by other similar self-storage facilities in the Carson City and Douglas County area. It is agreed that nothing contained in this Lease shall be deemed or construed as creating a partnership or joint venture between Lessor and Lessee or between Lessor and any other party, or cause Lessor to be responsible in any way for the debts or obligations of Lessee or any other party.

97-001-279

ARTICLE IV

USE OF PREMISES

4.01: Primary Use

Lessee shall have the right to use the Demised Premises for the purpose of constructing, operating, maintaining, repairing and replacing a self-storage facility containing not less than 20,000 square feet nor more than 90,000 square feet at a cost of not less than $15 per square foot; it being understood that the per square foot cost may include, but is not thereby limited to, land preparation, building, parking, pads and offsite work.

Lessee may add square footage at any time or times during the term of this Lease so long as the facility is not less than twenty thousand (20,000) square feet or more than ninety thousand (90,000) square feet.

4.02: Signs

Lessee shall have the right to erect and maintain upon the improvements and the Leased Land such signs as relate only to the business conducted in any improvements constructed thereon. No other signs, billboards, or other advertising devices may be erected upon the Demised Premises without the prior written consent of Lessor. Any signs located on the Leased Land as of the date of

672-001-97

the execution of the Lease shall be removed. Lessor shall not allow any signs on the Premises except those signs proposed by Lessee to be erected as herein permitted. Lessor agrees that it shall not permit any signage on adjacent properties on the west side of U.S. Highway 395 within two hundred (200) feet of Premises except that Lessor shall be entitled to permit signage not closer than one hundred (100) feet to the Premises so long as the signage is to identify an existing bonafide Lessee of the property upon which such signage is located and, further, that such signage does not block or interfere with view of Lessee's improvements and Lessee's signage on Premises.

ARTICLE V

CONSTRUCTION BY LESSEE

5.01: Lessee's Right to Build -- General Conditions

Lessee shall have the right, at any time and from time to time, during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace and remove the self-storage facilities contemplated herein, at no expense to Lessor, provided, however, that such improvements shall be constructed according to the standards and ratings of the building codes of the State of Nevada and Douglas County, and they shall be constructed in a good and workmanlike manner. The Washoe Tribe Planning Department has

informed Lessee that no permits are required in addition to the Bureau of Indian Affairs requirement of Federal Environmental items. Construction, at all stages, shall be subject to inspection by an agent to be designated by Lessor to ensure compliance with this Article. The inspection agent shall have the authority to halt construction or refuse to approve the building for occupancy if the provisions of this Article are not followed. Lessor shall bear the cost of paying for the services of the inspection agent.

5.02: Approvals

It is understood that the plans and specifications for any buildings or improvements to be erected by Lessee pursuant to §5.01 shall be submitted to Lessor for approval prior to the execution of this Lease prior to the start of any construction. Such approval shall not be unreasonably withheld, and in any event shall not constitute an assumption of any liability for the design, engineering or structural integrity of the building proposed to be erected by Lessee. Site plan, drainage plan, engineering specifications and exterior color selection, as approved by Lessor, shall be attached hereto as Exhibit D. Lessee and Lessor acknowledge the leased Premises are located on lands held in trust by the Bureau of Indian Affairs for the Washoe Tribe of Nevada and California and, accordingly, development of, and construction on, the Leased

672-001-97

Premises is not subject to, nor protected by, the State of Nevada or Douglas County, Nevada, within which political boundaries the Leased Premises lie.

5.03: <u>Buildings to be Within Demised Premises</u>

The new building or buildings (and any buildings in replacement thereof thereafter constructed) shall be completely independent buildings erected wholly within the boundary lines of the Demised Premises. Prior to commencement of construction, Lessee shall furnish to Lessor a survey of the Demised Premises prepared by a licensed surveyor along with plans showing the location of the building or buildings in relation to the perimeter of the Demised Premises.

5.04: <u>Due Diligence</u>

Lessee shall prosecute construction of any building erected on the Premises to completion with due diligence, subject, however, to unavoidable delays, i.e., delays due to strikes, acts of God, inability to obtain labor or materials (financial inability excepted), governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty, or similar causes or any other causes beyond the reasonable control of Lessee. Said construction shall not be commenced, however, unless and until the final plans,

672-001-97

specifications and erection details for the building to be erected shall have been approved by Lessor, which approval shall not be unreasonably delayed or withheld.

5.05: <u>Prerequisites to the Start of Construction</u>

No construction shall be commenced unless the following shall have first occurred:

a. Lessee at Lessee's expense shall have filed with the appropriate governmental body having jurisdiction with respect to development of the Leased Lands, including but not limited to the Bureau of Indian Affairs, complete plans, specifications, certificates, applications and any other documents required for the construction of the new building by Lessee, and said governmental body shall have issued all necessary permits for the start of construction. Said plans and specifications shall be the plans and specifications approved by Lessor as hereinabove provided. The completed Assessment Statement required by the Bureau of Indian Affairs, consistent with the National Environmental Protection Act, and the Bureau's approval thereof, shall be attached to this Lease as Exhibit "E" by the Washoe Tribe.

672-001-97

b. Lessee shall furnish to Lessor comprehensive general liability and property damage insurance, with contractual liability endorsement, insuring the indemnity hereinafter set forth, with combined single limits of not less than Three Hundred Thousand Dollars ($300,000.00) for any one accident or occurrence, the contract or contracts of insurance providing such coverage to be subject to the approval of Lessor. Lessor has reviewed the standard policy endorsement attached hereto as Exhibit F and approves that endorsement. The requirements set forth above may be satisfied by Lessee arranging for Lessor to be named as an additional insured on policies of insurance to be purchased by Lessee, provided that such policies shall be subject to the approval of Lessor. Any policy of liability insurance furnished hereunder must insure Lessor against any liability it may incur to the public and/or its employees as a result of the use of the Demised Premises by Lessee, or the operations thereon of any contractor or subcontractor working for Lessee. Any such insurance shall be primary and not contributing, and no policy or policies of insurance maintained by Lessor shall be subject to any claim for any liability arising out of an occurrence covered by the

672-001-97

insurance required herein. Lessee agrees that such policies of insurance will contain waivers of any right of subrogation against Lessor.

c. (i) There shall be delivered to Lessor a contractor's completion bond of a surety company licensed to do business in the State of Nevada, running to the Lessor as obligee, conditioned on the completion of the building in accordance with the plans and specifications and the provisions of this Lease, free and clear of all mechanics and other liens. Such bond shall be in such amount and in such form and written by such company as Lessor shall approve, which approval Lessor shall not unreasonably withhold. Said bond may also include as obligee, as its interest may appear, the leasehold mortgagee and any construction lender lending funds for the financing of the cost of construction of the building.

(ii) In lieu of a completion bond, Lessee may deliver to Lessor an irrevocable clean stand-by letter of credit or bond of a surety company as above-described or cash, running to Lessor, in the amount of $35,000.00, to guarantee the full performance of the contract for the construction of the building in accordance with the plans and specifications

672-001-97

as approved by the Lessor. When Lessee has completed the construction of the project to the satisfaction of the inspection agent, Lessor shall release any claims to any cash deposit, letter of credit or bond required herein.

d. Lessee shall have delivered to Lessor satisfactory proof that workmen's compensation insurance has been procured to cover all persons employed in connection with the construction on Indian lands.

e. Lessee agrees that it will require its general contractor and each subcontractor contracting with such general contractor to execute a contractor's entry agreement covering contractor's activities in and around the Leased Lands, should Lessor require such an agreement.

f. Lessee shall notify Lessor ten (10) days prior to the commencement of any work upon the Demised Premises.

g. Lessee shall submit to Lessor plans indicating repairs necessary to the Leased Lands for any existing soil erosion and, upon approval of such plans, shall take all steps necessary to remedy all soil erosion problems existing before construction begins.

672-001-97

h. Lessor hereby agrees to grant to Lessee ingress and egress to the Leased Lands via a route mutually agreeable to the parties. Lessor and Lessee shall both exercise good faith efforts to arrive at a mutually acceptable means of ingress and egress to the leased lands and, if those efforts shall fail, either party may then terminate this lease. Maintenance of such access shall be shared equally by Lessor and Lessee provided both parties agree to any expenses for maintenance before such expenses are incurred. Lessor shall assist in obtaining any encroachment permits necessary from the Nevada Department of Transportation for use, maintenance or improvement of the access to the Leased Lands.

5.06: <u>Lessee's Ownership of Improvements and Fixtures</u>

Subject to the provisions of §2.03 and §2.04 above, it is expressly understood and agreed that any and all buildings, improvements, fixtures, machinery and equipment of whatsoever nature at any time constructed, placed or maintained upon any part of the Leased Land shall be and remain the property of Lessee, or its sublessees, as their interests may appear. Lessee shall have the right at any time during Lessee's occupancy of the Leased Land, or within a reasonable time thereafter, to remove any and all

buildings, improvements, fixtures and equipment owned or placed by Lessee, its sublessees or licensees, in, under or upon the Leased Land, or acquired by Lessee, whether before or during the lease term. Upon the exercise of Lessor's option to purchase discussed in §2.03 or the purchase of Lessee's business and improvements pursuant to §2.04, all buildings, structures and all personal property owned by Lessee on the Leased Premises shall become the sole property of Lessor. If Lessee refuses to timely restore the Leased Lands after demand to do so by Lessor, Lessor may remove from the Leased Premises any buildings, structures and other personal property owned by Lessee, and Lessor may also restore the Leased Premises to substantially the condition in which they existed at the time Lessee took possession, except for grading and vegetation, and drainage, all at the expense of Lessee, which expense Lessee agrees to pay Lessor upon demand.

672-001-97

5.07: <u>Right to Cancel</u>

If Lessee shall not have commenced construction of the improvements contemplated herein within twelve (12) months of the date this lease is executed, Lessor shall have the right to cancel this Lease, whereupon Lessee shall have no further right, title or interest in or to the Demised Premises. Commencement of construc-

tion shall be deemed, for the purposes of this paragraph, to mean actual on-site construction proceeding in a workmanlike manner toward completion of the project as set out in the plans approved by Lessor.

ARTICLE VI

TAXES

6.01: Real Property and Improvements

Except as provided in Section 3.05 and 6.02 hereof, Lessee shall not be responsible for the payment of taxes, general and special assessments and other charges of any description commencing with the execution of this Lease and during the term hereof [including extensions] which may be levied upon or assessed against the Leased Land and all interests therein and all improvements and other property thereon, whether belonging to Lessor or Lessee.

672-001-97

6.02: Personal Property

Notwithstanding the provisions of §6.01, Lessee shall be responsible for the payment of personal property taxes imposed by governmental agencies other than Washoe Tribe or its affiliates.

Michel:

.Au

ARTICLE VII

INSURANCE TO BE MAINTAINED BY LESSEE

7.01: <u>Hazard Insurance</u>

At all times Lessee shall maintain the insurance below described for the mutual benefit of Lessor and Lessee against the following risks:

a. Loss or damage by fire and such other risks as may be embraced within the standard form of extended coverage insurance from time to time available (and builder's risk insurance during course of construction of any improvements) insuring the full replacement cost of any buildings and other improvements from time to time erected on the Demised Premises. Lessee agrees that for any new building to be constructed by Lessee (or any building or buildings in replacement thereof) the coverage upon completion of the building shall be in an amount not less than the full value of the improvement. If any of the risks covered by the currently employed customary extended coverage endorsement on fire policies are hereafter excluded from such endorsement, but are insurable nevertheless by separate policies regularly issued by fire or casualty companies doing business in the State of

672-001-97

Nevada, then the reference above to "risks as may be embraced within the standard form of extended coverage insurance" includes insurance coverage by such separate policy or policies;

b. Loss or damage by explosion of steam boiler, air conditioning equipment, pressure vessels or similar apparatus, now or hereafter installed in any building on the Premises in such limits with respect to any one accident as may reasonably be requested by Lessor from time to time; and

c. Such other insurance, and in such amounts as may from time to time be reasonably required by Lessor against other insurable hazards which at the time are commonly insured against in the case of Premises similarly situated, with due regard to the type of building, its construction and its use and occupancy.

672-001-97

7.02: <u>Liability Insurance</u>

Lessee shall also maintain at all times comprehensive general liability insurance, with a contractual liability endorsement insuring the indemnity hereinafter set forth, for the mutual benefit of Lessor and Lessee against claims for personal injury or death or property damage in or about the Demised Premises, and the

sidewalks, driveways and curbs adjacent thereto, with such limits as may reasonably be requested by Lessor, but not less than combined single limits of Five Hundred Thousand Dollars ($500,000.00) in the event of bodily injury or death of any number of persons in any one accident and broad form property damage coverage of not less than Three Hundred Thousand Dollars ($300,000.00). The limits of said policy shall be increased from time to time to meet changed circumstances, including, but not limited to, changes in purchasing power of the dollar and changes indicated by the course of plaintiff's verdicts in personal injury actions, and if the parties are unable to agree on the amount by which such limits are to be increased, the controversy shall be resolved by arbitration under the procedure in arbitration set forth in Article XVIII hereof. Lessor may not request a change in the limits of the policy as above provided for more often than once in any five (5) year period. The policies shall provide that any right of subrogation against Lessor and Lessee is waived.

7.03: <u>Workmen's Compensation Insurance</u>

Lessee shall also maintain workmen's compensation insurance covering all persons employed by it in the conduct of its business on the Demised Premises.

672-001-97

7.04: Deposit of Policies

a. All policies shall name Lessor and Lessee as the insureds as their respective interests may appear, but subject, nevertheless to loss payee provisions and provisions relative to disposition of insurance proceeds stated below in this Article.

b. All insurance shall be effected by valid and enforceable policies issued by insurers of responsibility and licensed to do business in the State of Nevada, such responsibility and the insuring agreements to meet with the reasonable approval of Lessor. The original policies under §7.01 may be delivered to any Leasehold Mortgagee and certificates of such insurance shall be delivered to Lessor. If there be no Leasehold Mortgagee, the original policies shall be delivered to Lessor. The policy under §7.02, or a copy thereof, together with a certificate attesting to its issuance, shall be delivered to Lessor. Prior to the expiration date of any policy, the original renewal policy for such insurance shall be delivered by Lessee to the holder of the expiring original policy, and certificates thereof, as the case may be, shall be delivered to Lessor, together with satisfactory evidence of

97-100-279

payment of the premium on such policy. To the extent obtainable, all such policies shall contain agreements by the insurers that (i) no act or omission by Lessee shall impair or affect the rights of the insureds to receive and collect the proceeds of the policy, (ii) such policy shall not be cancelled except upon ten (10) days prior written notice to each named insured and loss payee, (iii) the coverage afforded thereby shall not be affected by the performance of any work in or about the Demised Premises. In addition, all policies under §7.01 (a) and (b) and under §7.02 shall contain endorsements that the rights of the assured to receive and collect proceeds shall not be diminished because of any additional insurance carried by Lessee or Lessor on their own accounts.

7.05: <u>Consent to Blanket Insurance Policy</u>

Nothing in this article shall prevent Lessee from carrying insurance of the kind required of Lessee under a blanket insurance policy or policies which cover other properties owned or operated by Lessee as well as the Premises herein demised. Any such policy for Hazard Insurance must be in an amount sufficient to cover 100% of the replacement value of the damaged structure. The Lessee shall furnish Lessor with a written statement from the insurers

672-001-97

under such policy setting forth the amount of the total insurance allocated to the Demised Premises. Lessee shall furnish Lessor with copies of the schedule or make-up of all property affected by any such blanket policy within thirty (30) days after the filing of the schedule or make-up with the appropriate filing body. Lessor has reviewed the standard policy attached as Exhibit "D" and approved this to be used as the sample or guideline for this project and to be sufficient.

7.06: Increased Level of Fire Insurance

If Lessor claims that the amount of fire insurance required to be carried by Lessee is not sufficient to cover full replacement cost of any building, then Lessor may submit to Lessee a written appraisal of the replacement cost of the building, which appraisal shall be made by the insurer or insurers underwriting the risk, or a party acceptable to such insurer or insurers; and the replacement cost of the building, as given in said appraisal, shall, except as otherwise below provided, be deemed the full replacement cost of said building; provided, however, that if Lessee objects to the replacement cost as given by the aforesaid appraisal, and the parties cannot thereafter agree upon the amount of such replacement cost, then Lessee within twenty (20) days after the date of

672-001-97

submission to it of Lessor's appraisal, may notify Lessor at its election to have the building valued for the purpose of ascertaining the replacement cost thereof, by an appraiser competent to compute the replacement cost of the building. If Lessee shall not avail itself of the foregoing election within the twenty (20) day period aforementioned, then the replacement cost as determined by Lessor's appraiser shall be final and conclusive. The procedure hereinabove set forth shall apply whenever, and as often as, Lessor may claim during the period hereof that the fire insurance carried by Lessee does not equal full replacement cost, as aforesaid, but said procedure may not be invoked by Lessor more often than once in any thirty-six (36) month period during the term of the Lease. The costs of all appraisals above described shall be paid for by Lessee and if the same shall have been paid for in the first instance by Lessor, the amount thereof shall be reimbursed by Lessee to Lessor, as additional rental, on demand, provided, however, that if the appraisal by the appraiser selected by the Lessee is less than the appraiser procured by Lessor in the first instance, the latter appraisal shall be paid for by Lessor. The foregoing provisions of this section in no way affect or limit Lessee's engagements under §7.01 or relieve Lessee from any responsibility for having the

97-100-279

subject property insured for less than full replacement cost if it shall develop that the building was under-insured.

7.07: <u>Indemnification</u>

Lessee agrees to investigate, defend, indemnify and hold harmless Lessor from and against any and all loss, damage, liability, claims, demands, detriments, costs, charges and expense (including attorney's fees) and causes of action of whatsoever character which Lessor may incur, sustain or be subjected to on account of loss or damage to property and loss of use thereof and for bodily injury to or death of any persons (including, but not limited to property, employees, subcontractors, agents and invitees of each party hereto) arising out of or in any way connected with the work to be performed or occupancy, operation, maintenance, enjoyment or use of the Demised Premises under this Lease and arising from any negligence or misconduct of Lessee or its employees, subcontractors, agents and invitees.

Lessee shall further indemnify Lessor for any liability, loss or damage (including attorney's fees) arising out of Lessee's introduction of any hazardous material or toxic substance on the Property.

672-001-97

Nothing shall be interpreted to require Lessee to indemnify Lessor for the negligence or misconduct of Lessor and its employees, subcontractors, agents and invitees, and Lessor shall indemnify Lessee for all damages, costs and attorneys' fees incurred by Lessee as a result of Lessor's misconduct or negligence or that of its employees, subcontractors, agents and invitees. Nothing herein shall be interpreted to require Lessee to indemnify Lessor or remediate any hazardous material or toxic substance contamination which Lessee did not introduce or cause.

Lessee may conduct inspections of the demised Premises within thirty (30) days of the execution of this Lease to determine the existence of hazardous materials or toxic substances existing on the demised premises as of the date of execution of this lease. If such investigations identify hazardous materials or toxic substances creating conditions not suitable for Lessee's intended use of the demised Premises or for which Lessee could become liable, Lessee may withdraw from the transaction without further liability.

672-001-97

ARTICLE VIII

CONDEMNATION OF THE PROPERTY

8.01: Division of Proceeds

a. In the event of the taking or condemnation by any competent authority for any public or quasi-public use or purpose of the whole or materially all of the Demised Premises at any time during the term, this Lease shall terminate upon vesting of title in condemnor or the taking of possession by said condemnor, whichever first occurs.

b. If the values of the respective interests of Lessor and Lessee shall be determined by the court or jury determining the compensation to be paid by the condemning authority in the proceeding pursuant to which the Demised Premises shall have been taken or condemned, the value so determined shall be conclusive upon Lessor and Lessee. If such values shall not have been thus separately determined, such values shall be fixed by agreement between the Lessor and Lessee, on terms consistent with §2.03 and §2.04, or if they are unable to agree then the controversy shall be resolved by arbitration under the procedure to govern in arbitration as set forth in Article XVIII hereof.

672-001-97

8.02: Partial Taking

In the event of a partial taking or condemnation, i.e., a taking or condemnation of less than materially all of the Demised Premises, this Lease (except as hereinafter provided) shall nevertheless continue, but the monthly rental to be paid by Lessee shall thereafter be reduced in amounts proportionate to the extent to which the business of Lessee is interfered with as a result of the partial taking, and Lessee shall promptly restore the building as below provided. The award for the said taking or condemnation shall be apportioned as provided in §8.01 above. Lessee agrees to apply that portion of the compensation awarded to it as follows in the following priority:

a. FIRST: So much of it as shall be necessary to repair and restore the building to make the same a complete architectural unit as nearly as reasonably possible to the condition existing prior to the taking or condemnation shall be deposited with a depository under Article X to be used for such purpose.

b. SECOND: The balance shall belong to Lessee to be used for such purposes as it shall see fit.

Lessee shall undertake the work of repair and restoration as soon as reasonably practicable, and Lessee shall make such repairs and restoration even if the award balance is insufficient for the purpose.

Should such partial taking or condemnation (a) result in rendering the part of the Demised Premises remaining unsuitable for the purposes for which the building was designed or, (b) occur during the last five (5) years of the term, then Lessee or Lessor in either event upon thirty (30) days written notice to the other party given at any time during sixty (60) days after the vesting of title in the condemnor or the taking of possession by said condemnor, may cancel and terminate this Lease, the rental and other charges hereunder to be apportioned as of the date of the termination; the Lessee to be discharged from responsibility to restore the Demised Premises; and the Lessor to be discharged from any obligation to purchase Lessee's business and improvements in accordance with §2.04. In the circumstances of any such termination the Lessee shall be compensated in accordance with the provisions of §8.01.

672-001-97

8.03: <u>Controversies to be Resolved by Arbitration</u>

In the event that there be any controversy under §8.02 as to whether the remainder of the Premises are suitable for the purposes for which the building was designed, or if there be any controversy under this article as to whether there has been a taking of materially all of the Premises, the controversy shall be resolved by arbitration as provided for in Article XVIII hereof.

8.04: <u>Temporary Taking</u>

If the whole or any part of the Demised Premises or of the Lessee's interest under this Lease be taken or condemned by any competent authority for its or their temporary use or occupancy, this Lease shall not terminate by reason thereof and the Lessee shall continue to pay, in the manner and at the time herein specified the full amount of the monthly rent and all additional rent and other charges payable by the Lessee hereunder, and except only to the extent that Lessee may be prevented from so doing by the terms of the order of the condemning authority, to perform and observe all of the other terms, covenants, conditions and obligations hereof on the part of the Lessee to be performed and observed, as though such taking or condemnation had not occurred. In the event of any such temporary taking, or condemnation, the

672-001-97

Lessee shall be entitled to receive the entire amount of the award made for such taking, whether paid by way of damages, rent or otherwise, unless such period of temporary use or occupancy shall extend to or beyond the expiration of the term of this Lease, in which case such award shall be apportioned between the Lessor and the Lessee under the same provisions as the Section 2.03 buyout provision.

ARTICLE IX

DAMAGE OR DESTRUCTION OF IMPROVEMENTS

9.01: <u>Lessee's Absolute Duty to Repair</u>

If any building or improvement at any time on the Demised Premises shall be damaged or destroyed by any cause whatsoever, during the term of this Lease, Lessee shall, with reasonable promptness, repair and replace the same at its own expense, to at least the condition existing immediately prior to such damage or destruction, and shall do so, even though the proceeds of any insurance policies covering the loss shall be insufficient to reimburse Lessee therefore; provided, however, that if such proceeds of insurance are more than sufficient to pay the cost of any such rebuilding, Lessee shall be entitled to receive any surplus.

96-100-279

9.02: No Abatement of Rent

Lessee shall not be entitled to any abatement of rent, nor shall its obligations under this Lease be terminated during the term hereof, notwithstanding any destruction or damage to any improvements on the Demised Premises by any cause whatsoever; provided, however, that if any improvements on the Demised Premises are substantially destroyed by fire or other casualty at any time during the last five (5) years of the term of this Lease or any extension thereof, then Lessee may cancel and terminate this Lease by written notice given to Lessor within sixty (60) days after the date of such destruction. Rent and other charges hereunder are to be apportioned as of the date of destruction. Lessee shall thereupon be discharged from responsibility to repair the damage, but all proceeds of insurance covering the loss shall, in that circumstance, belong to Lessor free of any claim thereto by Lessee, subject, however, to the rights of any Leasehold Mortgagee.

672-001-97

ARTICLE X

DISBURSEMENT OF INSURANCE PROCEEDS AND OTHER FUNDS
BY LEASEHOLD MORTGAGEE OR OTHER DEPOSITORY

10.01: Depository

All insurance proceeds or condemnation proceeds or expenses for the building or restoration or alteration work on the building

paid to any Leasehold Mortgagee or paid to or deposited with the bank or trust company meeting the qualifications stated in §7.05 (b) (herein in each case called the "Depository") shall be paid to them in the order named and shall be disbursed in the manner hereinafter provided.

10.02: <u>Disbursement in Stage Payments</u>

From time to time as (i) any change or alteration of the kind described in §11.01 progresses, or (ii) the restoration, repair, replacement or rebuilding of any improvement resulting from damage by fire or any other cause, or as a result of a partial taking in a condemnation proceeding (hereinafter collectively referred to in this article as the "Work"), disbursement of any monies shall be made by Depository in stage payments as the Work is prosecuted by Lessee, less a "Retention Fund" of ten percent (10%) of each payment, upon certificates of the architect or engineer in charge of the Work certifying to the cost of the Work performed to the date of the certificate and the amount thereof unpaid and justly due and upon satisfactory proof that there are no mechanic's or materialmen's liens filed and undischarged pertaining to the Work. The Retention Fund shall be paid over by Depository to Lessee within thirty (30) days after recordation of a Notice of Completion

672-001-97

of the Work and upon satisfactory proof that all costs have been paid or provided for. The Depository may require the submission to it of any additional data reasonably required by it to insure that the payment is, in all respects, proper. In no event shall any payment be required to be made to Lessee until Lessee shall have expended for the Work an amount equal to the excess of any loss over the amount paid by any insurance carrier on the adjustment of any loss, and due proof of payment for such excess shall have been submitted by Lessee, but the foregoing provisions of this sentence are not to be construed as a consent to insuring for less than full replacement costs. All payments shall be received by Lessee in trust to pay the cost of the Work and shall not be commingled with Lessee's other funds. Lessor and the Depository shall have the right to examine Lessee's contracts, books and records pertaining to the Work. Nothing herein prevents the Depository from imposing such additional conditions to the disbursement of funds as it may, in the circumstances, deem prudent and necessary to achieve the prosecution and completion of the Work and the full and due payment thereof.

97-100-2769

10.03: Depository's Fees and Expenses

After paying or providing for the cost of the Work, the expenses and fees of the Depository may be charged against the fund in its hands, but if the deposited funds are insufficient to achieve this, the Lessee shall pay any deficiency.

10.04: Nonliability of Depository

The Depository shall not be responsible to the Lessor nor to the Lessee for any payment made by it in good faith and in accordance with the provisions hereof.

ARTICLE XI

CHANGES AND ALTERATIONS BY LESSEE

11.01: Conditions to be Observed by Lessee

After construction and completion of the new buildings, but not before, Lessee shall have the right after giving Lessor fifteen (15) days written notice and after securing Lessor's reasonable approval from time to time, to make such changes, alterations, demolition or new construction, structural or otherwise, to the improvements or to construct new improvements on the Demised Premises as Lessee shall deem necessary or desirable. Such changes, alterations, demolition, new construction or new improvements (in this article referred to as the "Work") shall be made in

672-001-97

all cases subject to the conditions hereinafter set forth which Lessee covenants to observe and perform.

11.02: Lessee to Secure all Necessary Approvals

No changes or alterations shall be undertaken until Lessee shall have procured and paid for, so far as the same may be required from time to time, all governmental permits and authorizations of various departments and governmental subdivisions having jurisdiction, and Lessor shall, but without cost or expense to Lessor, join in the application for such permits or authorizations whenever such action is deemed by Lessee to be necessary, provided, however, that Lessor shall have the right to object to conditions imposed by such authority deemed by it to be unreasonable.

11.03: Work to be Supervised by Architect or Engineer, Lessor's Approval

Any Work shall be conducted under the supervision of an architect or engineer licensed in the State of Nevada selected by Lessee for the purpose, and if the estimated cost as determined by such architect or engineer of the Work to be performed exceeds Twenty-five Thousand Dollars ($25,000.00), the architect or engineer so selected, as well as his plans and specifications shall meet with the approval of Lessor, which approval Lessor shall not

672-01-97

unreasonably withhold. Such approval shall not constitute an assumption of any liability for the design, engineering or structural integrity of the building or alterations proposed to be erected or performed by Lessee.

11.04: <u>Value and Utility of Improvements Not to Be Impaired</u>

All Changes and Alterations shall be of such a kind, when completed, that the value and utility of the improvements on the Demised Premises shall not be less than the value and utility of the improvements immediately before any such Work; except that in the case of Work involving demolition and the construction of a new building, such new building will be of a value not less than the value of the building to be demolished.

11.05: <u>Work to Be Done in Workmanlike Manner; Insurance</u>

All Work shall be done in a good and workmanlike manner and in compliance with the applicable building and zoning laws and with all laws, ordinances, orders and requirements of all sovereign authorities and the appropriate departments, commissions, boards and officers thereof. The cost of any such Work shall be paid in cash or its equivalent, so that the Demised Premises shall at all times be free of liens for labor and materials supplied or claimed to have been supplied. The Work shall be prosecuted with reason-

672-001-97

able dispatch, but unavoidable delays will be excepted. Workmen's compensation insurance covering all persons employed in connection with the Work shall have been procured before any Work is begun; and comprehensive general liability insurance with contractual liability endorsement, and property damage insurance for the mutual benefit of Lessor and Lessee with limits not less than those required to be carried pursuant to §5.05 shall be maintained at Lessee's sole cost and expense at all times when any Work is in progress. Lessee, in addition, will require its contractor and all subcontractors to execute Lessor's standard form of contractor's entry agreement.

11.06: <u>Bonds Required</u>

No Work undertaken as a single project and involving an estimated cost aggregating more than Twenty-five Thousand Dollars ($25,000.00) shall be undertaken until Lessor shall have been furnished by Lessee, at Lessee's expense, security as described in subdivision (c)(i) & (ii) of §5.05, but conditioned in this instance upon the completion of the Work in the same manner as therein described in respect to the building referred to in that section. Such bond may include any Leasehold Mortgagee.

672-001-97

11.07: Rent Deposit

If the Work entails the demolition of a building and/or the construction of new buildings, Lessee must deposit with Lessor before commencing any Work, an amount equal to one year's rental payment in accordance with §3.02 and any anticipated taxes, or in lieu thereof, unconditional guarantees for the payment of such rental and taxes by responsible persons reasonably satisfactory to Lessor. In lieu of such deposit or guarantee, Lessee may deposit with Lessor an irrevocable clean stand-by letter of credit of a bank or trust company designated by lessee, but subject to the written approval of Lessor, which approval shall not be unreasonably withheld. Said letter of credit shall be in the amount of the net rental and taxes required to be deposited by the foregoing provisions of this subdivision. If the parties shall be unable to agree as to what that net rental and taxes shall be, the controversy shall be resolved by arbitration under the provisions of Article XVIII, but pending resolution of the controversy the letter of credit shall be in an amount not less than the minimum rental for the one (1) year following the proposed date for the beginning of demolition and/or the construction of new buildings. The letter of credit shall state that it is payable unconditionally to the

672-001-97

Lessor or order upon presentation of the letter before the expiration dates set forth therein. Lessor shall not present said letter of credit for payment unless:

(i) There is a default in payment of rental or in any other obligation of Lessee, whereupon the funds paid upon said letter of credit may be held and employed by Lessor to correct Lessee's default and to reimburse Lessor for any damages sustained by Lessor; or,

(ii) the letter expires before the date of completion of the new building and at least ten (10) days before the expiration of the letter of credit a renewal letter of credit shall not have been delivered to Lessor, it being the intention hereof that Lessee must keep renewing the letter until the time when it is no longer required by the foregoing provisions to have such letter on deposit with Lessor, without any need on the part of Lessor to give Lessee any notice that it is in default in supplying such renewal, any provisions hereof as to notice of default to Lessee to the contrary notwithstanding.

672-001-97

Any funds in Lessor's hands upon the cashing by Lessor of the letter of credit at the time of completion of the new building

shall be returned to Lessee if Lessee is not then in default hereunder, but if there is such a default, Lessor may continue to retain the funds and apply the same until the default is cured.

## ARTICLE XII

## ASSIGNMENT, SUBLETTING AND MORTGAGING

### 12.01: Assignment by Lessee

This Lease may not be assigned by Lessee without the prior written consent of Lessor and the Secretary, which consent shall not be unreasonably withheld. In any event, no such assignment shall be valid unless there shall be delivered to Lessor in due form for recording, within ten (10) days after the date of the assignment (a) a duplicate original of the instrument of assignment, and (b) an instrument of assumption by the transferee of all of the Lessee's obligations under this Lease. Upon any assignment of this Lease conforming to the terms hereof, but not otherwise, the assignor shall be released from the performance of obligations on the part of Lessee thereafter to be performed under this Lease, except any obligation to hold and apply monies held by the assignor at the date of the assignment, the disposition whereof is governed by the terms of this Lease, and except further any unperformed obligations which shall have matured prior to such assignment.

672-001-97

Without limiting any of the foregoing, but in addition thereto, any assignment in contravention of the terms hereof is void, but this shall not impair any remedy of Lessor because of Lessee having engaged in an act prohibited by the terms hereof.

12.02: Subletting by Lessee

a. Lessee may sublet the whole or any portion of the Demised Premises, subject to the provisions hereinafter set forth which, if not observed, render the subletting void, but without thereby impairing any remedy of Lessor because of Lessee having engaged in any act prohibited by the terms hereof.

b. Except in regard to rentals in the ordinary course of business, prior to entering into any sublease for space in any building to be erected by Lessee, Lessee will furnish to Lessor for Lessor's approval the form of sublease which Lessee proposes to enter into with such space occupant or occupants, together with the floor plan for all of the space proposed to be sublet by Lessee. Such standard form of sublease shall contain a provision substantially to the effect that if there be any termination whatever of this Lease then the sublessee, at the request of Lessor, will attorn to Lessor, and the

672-001-97

sublease shall continue in effect with Lessor. Such sublease shall not serve to relieve the sublessor from any liability nor diminish any supervisory authority of the Secretary provided for under this Lease.

c. Lessor agrees to enter into Nondisturbance and Attornment Agreements with sublessees of Lessee if the sublease of such sublessee shall have been first approved in writing by Lessor, which approval shall not be unreasonably withheld. Without limiting that which would constitute reasonable grounds for Lessor's withholding of approval, it is agreed that it shall not be deemed unreasonable for Lessor to refuse to give such consent to any such sublease if the rental reserved by such sublease shall be less than the fair market rental in respect to the Premises therein demised at the time of the execution of such sublease, taking into account the term of such sublease and possible graduation in rental during such term. In no circumstance shall Lessor be required to give its approval if such sublease (i) calls for the granting of a concession in rent at any time except during the first sixty (60) days of the term of such sublease made to an actual space occupant for the space to be occupied by him or allows

97-100-2-672

the prepayment of rent beyond the current month for which rent is due and payable except the prepayment of rental for the last month of the term of such a space occupant for his said space, or (ii) would impose upon the Lessor any obligation to make alterations to the Premises demised under the sublease or to pay the sublessee for alterations made by it.

## ARTICLE XIII

## USE OF THE PREMISES

13.01: Limits on Use

During the term of this Lease the Demised Premises and all improvement constructed and maintained thereon shall be used by Lessee for the use specified above and for no other use or purpose. Lessee shall not use or permit any other person to use the Premises, or any part thereof, for any purposes tending to injure the reputation thereof or for any improper or offensive use or to constitute a nuisance; and Lessee shall at all times during said term conform to, and cause all persons using or occupying any part of said Premises to comply with all public laws, ordinances, and regulations from time to time applicable thereto and to all operations thereon. Lessee shall not commit any waste upon the

672-001-97

Demised Premises, and Lessee shall not allow any sublessee to commit any waste upon the Demised Premises.

13.02: Indemnity for Violation of Law

a. Lessee covenants and agrees to indemnify and save Lessor harmless from any penalties, damages, or charges imposed for any violation of any and all laws, ordinances, and regulations applicable to the use and occupancy of the Demised Premises, whether occasioned by neglect, omission or willful act of Lessee or any person upon the Demised Premises by license or invitation of Lessee or holding or occupying the same or any part thereof under or by right of Lessee.

b. Lessee shall have the right to contest by appropriate legal proceedings, without cost or expense to Lessor, the validity of any law, ordinance or regulation of the nature herein referred to. If, by the terms of such law, ordinance, or regulation, compliance therewith may be legally held in abeyance without subjecting Lessor to any liability or whatsoever nature for the failure to so comply therewith, compliance therewith may be postponed until the final determination of such proceeding. Lessee, upon commencing such contest shall furnish to Lessor a document guaranteeing that

672-001-97

Lessor and Lessor's interest in the Demised Premises shall be saved harmless from any penalty, damage, charge or claim resulting from such contest.

ARTICLE XIV

DEFAULT AND REMEDIES

14.01: Events of Default

Each of the following events shall be a default by Lessee and a breach of this Lease:

a. Abandonment or surrender of the Premises or of the leasehold estate, or failure or refusal to pay when due any installment of rent or any other sum required by this Lease to be paid by Lessee, or to perform as required or conditioned by any other covenant or condition of this Lease.

b. The subjection of any right or interest of Lessee to attachment, execution, or other levy, or to seizure under legal process, if not released within thirty (30) days provided that the foreclosure of any mortgage permitted by provisions of this Lease relating to purchase or construction of improvements shall not be construed as a default within the meaning of this paragraph.

672-001-97

c. The appointment of a receiver to take possession of the Premises or improvements or of Lessee's interest in the leasehold estate or of Lessee's operations on the Premises for any reason, including but not limited to assignment for benefit of creditors or voluntary or involuntary bankruptcy proceedings, but not including receivership (i) pursuant to administration of the estate of any deceased or incompetent Lessee or of any deceased or incompetent individual member of any Lessee, or (ii) pursuant to any mortgage permitted by provisions of this Lease relating to purchase or construction of improvements, or (iii) instituted by Lessor, the event of default being not the appointment of a receiver at Lessor's instance but the event justifying the receivership, if any.

672-001-97

d. An assignment by Lessee for the benefit of creditors or the filing of a voluntary or involuntary petition by or against Lessee under any law for the purpose of adjudicating Lessee as bankrupt; or for extending time for payment, adjustment or satisfaction of Lessee's liability; or for reorganization, dissolution, or arrangement on account of or to prevent bankruptcy or insolvency; unless the assignment or proceeding, and all consequent orders, adjudications, custo-

dies and supervisions are dismissed, vacated or otherwise permanently stayed or terminated within thirty (30) days after the assignment, filing, or other initial event.

14.02: <u>Notice as Precondition to Lessor's Remedies</u>

As a precondition to pursuing any remedy for an alleged default by Lessee, upon a showing satisfactory to the Secretary that there has been a violation of this Lease or a violation of controlling regulations, Lessor shall serve Lessee with written notice setting forth in detail the nature of the alleged violation and allowing Lessee ten (10) days from the date of receipt of notice in which to show cause why the lease should not be cancel-led. Such notice of default must also be given to all sureties, all qualifying subtenants and all Leasehold Mortgagees whose names and addresses were previously given to Lessor in a notice or notices from Lessee or any Leasehold Mortgagees stating that the notice was for the purpose of notice under this provision. A qualifying subtenant is a subtenant in possession under an existing sublease which is proper under this Lease. Each notice of default shall specify in detail the alleged event of default and the intended remedy.

672-001-97

14.03: Lessee's Right to Cure Defaults

If within the ten (10) day period provided for in §14.02 it is determined that the breach may be corrected and Lessee agrees to take the necessary corrective measures, Lessee will be given an opportunity to carry out such measures and shall be given a reasonable time within which to take corrective action to cure the breach.

14.04: Rights of Subtenants; Nondisturbance Clause

Any subtenant of the entire Premises, and any subtenant of such a subtenant, shall have the right, at its election, to cure a curable default of this Lease or under any Leasehold Mortgage then existing under the provisions of this Lease relating to purchase or construction of improvements, or under both. If any such subtenant cures all defaults then existing, or if any such subtenant cures all defaults that are then curable, and other defaults are noncurable, or if all then existing defaults are noncurable, that subtenant's possession and use shall not be disturbed by Lessor or by any Leasehold Mortgagee as long as (i) the subtenant performs his subleases's provisions, (ii) the subtenant attorns to Lessor and Leasehold Mortgagee according to their respective interests,

672-00-1-97

and (iii) subsequent defaults are cured as in the above provisions or are not curable.

14.05: <u>Lessor's Remedies</u>

If any default by Lessee shall continue uncured, following notice of default as required by this Lease, for the period applicable to the default under the applicable provision under this Lease, Lessor has the following remedies in addition to all other rights and remedies provided by law or equity, to which Lessor may resort cumulatively or in the alternative:

a. Lessor may at Lessor's election, terminate this Lease by giving Lessee notice of termination. The notice of termination must inform Lessee of its right to appeal pursuant to 25 CFR 2. Absent such an appeal, on the giving of the notice, all Lessee's rights in the Premises and in all improvements shall terminate and Lessee shall surrender and vacate the Premises and all improvements in broom clean condition, and Lessor may re-enter and take possession of the Premises and all remaining improvements and eject all parties in possession or eject some and not others or eject none; provided that no subtenant qualifying under nondisturbance provisions of this Lease shall be ejected. Termination under

672-001-97

this paragraph shall not relieve Lessee from the payment of any sums then due to Lessor from any claim or damages previously accrued or then accruing against Lessee.

b. Lessor may, at Lessor's election, reenter the Premises without terminating this Lease, and at any time and from time to time relet the Premises or improvements or any part or parts of them for the account and in the name of Lessee or otherwise. Lessor may at Lessor's election eject all persons or eject some and not others or eject none, provided that no subtenant qualifying under nondisturbance provisions of this Lease shall be ejected. Lessor shall apply all rents from reletting as in the provision on assignment of subrents hereinafter set forth. Any reletting may be for the remainder of the term or for a longer or shorter period. Lessor may execute any leases made under this provision either in Lessor's name or in Lessee's name and shall be entitled to all rents from the use, operation, or occupancy of the Premises or improvements or both. Lessee shall nevertheless pay to Lessor on the due date specified in this Lease the equivalent of all sums required of Lessee under this Lease, plus Lessor's expenses, less the avails of any reletting or

672-001-97

attornment. No act by or on behalf of Lessor under this provision shall constitute a termination of this Lease unless Lessor gives Lessee notice of termination.

c. Lessor may at Lessor's election use Lessee's personal property and trade fixtures or any of such property and fixtures without compensation and without liability for use or damage, or store them for the account and at the cost of Lessee. The election of one remedy for any one item shall not foreclose an election of any other remedy for another item or for the same item at a later time.

d. Lessor shall be entitled at Lessor's election to each installment of rent or to any combination of any installment for any period before termination, plus interest at the rate of ten percent (10%) per year from the due date of each installment. Avails of reletting or attorned subrents shall be applied, when received, as follows: (i) to Lessor to the extent that the avails for the period covered do not exceed the amount due from and charged to Lessee for the same; and (ii) the balance to lessee. Lessor shall make reasonable efforts to mitigate Lessee's liability under this provision.

672-001-97

e. In the event that Lessor terminates this Lease because of a breach hereof, Lessor may recover from Lessee:

(i) The worth at the time of award of the unpaid rent (including charges equivalent to rent) which had been earned at the time of termination,

(ii) The worth at the time of award of the amount of the unpaid rent (including charges equivalent to rent) which would have been earned after termination, less any amount of unpaid rent which Lessee proves could have been reasonably avoided,

(iii) The worth at the time of award of the amount by which the unpaid rent (including charges equivalent to rent) for the balance of the term after the time of award exceeds the amount of such rental loss that Lessee proves could be reasonably avoided;

(iv) Any other amount necessary to compensate Lessor for all the detriment proximately caused by Lessee's failure to perform his obligations under the Lease or which in the ordinary course of things would be likely to result therefrom.

672-001-97

The "worth at the time of award" of the amounts referred to in (i) and (ii) above shall include interest at the maximum legal rate. The "worth at the time of award" of the amount referred to in (iii) above shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%). Nothing in this paragraph shall affect the right of Lessor to indemnification for liability arising prior to the termination of the Lease for personal injuries or property damage as provided in Article VII hereof. Nothing herein provided shall affect Lessor's rights relating to actions for unlawful detainer, forcible entry, and forcible detainer.

f. Lessee assigns to Lessor all subrents and other sums falling due from subtenants, licensees, and concessionaires (herein called subtenants) during any period in which Lessor has the right under this Lease, whether exercised or not, to reenter the Premises for Lessee's default, and Lessee shall not have any rights to such sums during that period.

97-10-2-679

## ARTICLE XV

## SURRENDER AND REMOVAL

15.01: Surrender of Possession

a. Upon Lessor's exercise of its option to purchase the Demised Premises pursuant to §2.03 above, or termination thereof, Lessee shall surrender to Lessor possession of the Demised Premises and all improvements constructed and installed thereupon, free and clear of all encumbrances done, made or suffered by Lessee.

b. If Lessee shall not then be in default under any of the covenants and conditions hereof, Lessee may remove or cause to be removed all movable furniture, furnishing and equipment installed in the improvements on the Demised Premises. Any of said personal property that is not removed from said Demised Premises within thirty (30) days after the date of any termination of this Lease thereafter shall belong to Lessor without the payment of any consideration, subject to the rights of any person holding a security interest therein.

97-01-2679

15.02: Lessee's Quitclaim

Upon the expiration of the Lease Term or any sooner buyout under §2.03 or the termination of this Lease, Lessee agrees to

execute, acknowledge and deliver to Lessor a proper instrument in recordable form, releasing and quitclaiming to Lessor all right, title and interest of Lessee in and to the Demised Premises and all improvements thereon.

ARTICLE XVI

LESSOR'S GENERAL PROTECTIVE PROVISIONS

16.01: Lessor's Right of Entry and Inspection

Lessee shall permit Lessor or Lessor's agents, representatives or employees to enter upon the Demised Premises for the purposes of inspecting, determining whether agreements in this Lease are being complied with, maintaining, repairing or altering the land, or showing the Demised Premises to prospective lessees, purchasers, mortgagees or beneficiaries under deed of trust.

16.02: Lessor's Right to Cure Default

In the event Lessee shall fail to pay and discharge or cause to be paid and discharged, when due and payable, any tax, assessment, or other charge upon or in connection with the Demised Premises, or any lien or claim for labor or material employed or used in, or any claim for damage arising out of the construction, repair, restoration, replacement, maintenance and use of the Demised Premises and the improvements thereon, or in judgment on

97-100-279

any contested lien or claim thereof, or any insurance premium or expense in connection with the Demised Premises and the improvements thereon, or any other claim, charge or demand which Lessee has agreed to pay or cause to be paid under the covenants and conditions of this Lease, and if Lessee, after ten (10) days written notice from Lessor so to do, shall fail to pay and discharge the same, then Lessor may, at its option, pay any such tax, assessment, insurance expense, lien, claim, charge or demand, or settle or discharge any action therefore or judgment thereon, and all costs, expenses and other sums incurred or paid by Lessor in connection with any of the foregoing shall be paid by Lessee to Lessor upon demand, together with interest thereon at the rate of ten percent (10%) per annum from the date incurred or paid, and any default in such payment shall constitute a breach of the covenants and conditions of this Lease.

16.03: <u>Accord and Satisfaction</u>

No payment by Lessee or receipt by Lessor of a lesser amount then the rental shall be deemed to be other than on account of the rental, nor shall any endorsement or statement on any check or any letter accompanying any check or statement as rent be deemed an accord and satisfaction, and Lessor may accept such check or

97-10-2679

payment without prejudice to Lessor's right to recover the balance of the rental or pursue any other remedy provided for in this Lease.

16.04: Transfer by Lessor -- Release From Liability

In the event Lessor shall sell or transfer the Demised Premises or any part thereof, and as a part of such transaction shall assign its interest as Lessor in and to this Lease, then from and after the effective date of such sale, assignment, or transfer, Lessor shall have no further liability under this Lease to Lessee except as to matters of liability which shall have accrued and are unsatisfied as of such date, it being intended that the covenants and obligations contained in this Lease on the part of Lessor shall be binding upon Lessor and its successors and assigns only during and in respect of their respective successive periods of ownership. Lessee shall, immediately upon written request from any such assignee, execute and deliver to such assignee an instrument in proper form by which Lessee attorns to said assignee.

16.05: Reservation of Minerals

There is reserved to Lessor the title and exclusive right to all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or

672-001-97

underlying said Premises, or that may be produced therefrom, including, without limiting the generality of the foregoing, all petroleum, oil, natural gas and other hydrocarbon substances and products derived therefrom and all geothermal steam or brines which may be produced or derived therefrom, together with the exclusive and perpetual right thereto, without, however, the right to use or penetrate the surface of, or to enter upon said Premises within five hundred (500) feet of the surface thereof, to extricate or remove the same.

ARTICLE XVII

GENERAL PROVISIONS

17.01: Conditions and Covenants

All of the provisions of this Lease shall be deemed as running with the land, and construed to be "conditions" as well as "covenants" as though the words specifically expressing or imparting covenants and conditions were used in each separate provision.

17.02: Waiver of Breach

No failure by either Lessor Lessee to insist upon the strict performance by the other of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy

672-001-97

consequent upon a breach thereof, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No waiver of any breach shall affect or alter this Lease, but each and every covenant, condition, agreement and term of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach.

17.03: <u>Time of the Essence</u>

Time is of the essence of this Lease, and of each provision thereof.

17.04: <u>Computation of Time</u>

The time in which any act provided by this Lease is to be done is computed by excluding the first day and including the last, unless the last day is a Saturday, Sunday or holiday, and then it is also excluded.

17.05: <u>Unavoidable Delay -- Force Majeure</u>

If either party shall be delayed or prevented from the performance of any act required by this Lease by reason of acts of God, strikes, lockouts, labor troubles, inability to secure materials, restrictive governmental laws, or regulations or other cause, without fault and beyond the reasonable control of the party obligated (financial inability excepted) performance of such act

672-001-97

shall be excused for the period of the delay; and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay, provided, however, that nothing in this section shall excuse Lessee from the prompt payment of any rental or other charge required of Lessee except as may be expressly provided elsewhere in this Lease.

17.06: <u>Successors in Interest</u>

Each and all of the covenants, conditions and restrictions in this Lease contained shall inure to the benefit of and shall be binding upon the successors in interest of Lessor, and, subject to the restrictions of Article XII, the authorized encumbrancers, assigns, transferees, subtenants, licensees, and other successors in interest of Lessee.

17.07: <u>Entire Agreement</u>

This Lease contains the entire agreement of the parties with respect to the matters covered by this Lease, and no other agreement, statement or promise made by any party, to any employee, officer, or agent of any party, which is not contained in this Lease shall be binding or valid.

672-001-97

17.08: <u>Partial Invalidity</u>

If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

17.09: <u>Relationship of Parties</u>

Nothing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Lessor and Lessee, and neither the method of computation of rent nor any other provisions contained in this Lease nor any acts of the parties shall be deemed to create any relationship between Lessor and Lessee, other than the relationship of Lessor and Lessee.

17.10: <u>Interpretation and Definitions</u>

The language in all parts of this Lease shall in all cases be simply construed according to its fair meaning and not strictly for or against Lessor or Lessee. Unless otherwise provided in this Lease, or unless the context otherwise requires, the following definitions and rules of construction shall apply to this Lease.

672-001-97

a. Number and Gender. In this Lease neuter gender includes the feminine and masculine and the singular number includes plural and the word "person" includes corporation, partnership, firm or association wherever the context so requires.

b. Mandatory and Permissive. "Shall," "will," and "agree" are mandatory; "may" is permissive.

c. Captions. Captions of the articles, sections and paragraphs of this Lease are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify, or aid in the interpretation, construction or meaning of the provisions of this Lease.

d. Term Includes Extensions. All references to the term of this Lease or the "Lease Term" shall include any extension of such term.

e. Land and Premises. Leased land, land, leased Premises, Demised Premises and Premises shall include the improvements to the land.

f. Parties. Parties shall include the Lessor and Lessee named in this Lease.

672-001-97

g. <u>Sublessee</u>. As used herein, the word "Sublessee" shall mean and include, in addition to a sublessee and a subtenant, a licensee, concessionaire, or other occupancy or user of any portion of the Demised Premises or buildings or improvements thereon.

h. <u>Buildings</u>. The word "Building" or "Buildings" includes any and all improvements at any time upon the Demised Premises, now existing thereon or thereafter constructed, and any betterments thereof. In addition to the commonly used meaning of "Building," that term includes all pipes, engines, wiring, ventilating, air conditioning and heating equipment, plumbing, lighting fixtures, swimming pools and any other equipment or machinery used in or about the maintenance or operation of the buildings.

i. <u>Undertaking</u>. Wherever reference is made in this Lease to an engagement by Lessee to perform a certain undertaking it shall mean that as to that undertaking or engagement, that Lessee has covenanted for its performance, and the expression "Undertaking," "Undertakes," "Engages," or "Engagement" shall be so construed in each instance.

672-001-97

j. <u>Assignment</u>. In any circumstance when an assignment of this Lease is restricted by the terms of this Lease, an assignment of this Lease includes, but is not limited to, a transfer of fifty-one percent (51%) or more of the stock of the Lessee corporation, if the holder of the Lessee's interest in this Lease be a corporation, but any such transfer consequent upon the death of a stockholder or resulting from a gift by a stockholder to the immediate members of his family shall not be deemed a transfer within the meaning of the foregoing.

k. <u>Leasehold Mortgage</u>. The term "Leasehold Mortgage" means a mortgage of Lessee's leasehold interest under this Lease, and includes a Deed of Trust conveying Lessee's leasehold interest under this Lease as security for a construction loan or loans and "Take Out" loan or loans to finance construction or purchase of the improvements to be erected on the Demised Premises.

l. <u>Leasehold Mortgagee</u>. The term "Leasehold Mortgagee" means the holder of a Leasehold Mortgage under this Lease, and includes any beneficiary under a Deed of Trust conveying Lessee's leasehold interest under this Lease as aforesaid.

672-001-97

17.11: <u>Attorney's Fees</u>

In the event either Lessor or Lessee shall bring any action or proceeding for damages for an alleged breach of any provision of this Lease, including, but not limited to arbitration, to recover rents, or to enforce, protect, or establish any right or remedy of either party, the prevailing party shall be entitled to recover as a part of such action or proceeding reasonable attorney's fees and court costs.

17.12: <u>Interest</u>

Any sum accruing to Lessor or Lessee under the provisions of this Lease which shall not be paid when due shall bear interest at the rate of ten percent (10%) per annum from the date written notice specifying such nonpayment is served on the defaulting party, until paid.

17.13: <u>Modification</u>

This Lease is not subject to modification except in writing signed by both parties hereto.

17.14: <u>Delivery of Rent and Notices -- Method and Time</u>

All rents or other sums, notices, demands, or requests from one party to another may be personally delivered or sent by mail, certified or registered, postage prepaid, to the addresses stated

97-10-2279

in this section, and shall be deemed to have been given at the time of personal delivery or forty-eight (48) hours after the time of mailing.

Any notice which either party may or is required to give to the other shall be given by mailing the same, postage prepared, sent certified mail, return receipt requested, and deposited in a receptacle for U.S. mail, addressed as hereafter provided:

| | |
|---|---|
| <u>Lessor</u>: | Washoe Development Enterprise<br>919 Highway 395<br>Gardnerville, Nevada 89410 |
| <u>With a copy to</u>: | **Bureau of Indian Affairs**<br>**Superintendent, Western Nevada Agency**<br>**1677 Hot Springs Road**<br>**Carson City, Nevada 89706** |
| <u>Lessee</u>: | Carson Valley/Tahoe Self-Storage, L.L.C.<br>P.O. Box 2010<br>Stateline, Nevada 89449 |

Any change in the address of any party shall be given by the party having such change of address to the other parties in the manner set forth above. Once such notice of change of address has been given, all notices shall thereafter be given in accordance with the notice of change of address. Notices given before the actual receipt of the notice of change of address shall not be invalidated by the subsequent change of address.

17.15: Federal Trust Responsibility

1. The parties hereby acknowledge that the Leased Premises are held in trust by the United States Department of the Interior, Bureau of Indian Affairs, for the benefit of Lessor. As long as the Demised Premises remain in trust status, all of Lessee's obligations under this Lease, and the obligations of its sureties, are to the United States as well as to Lessor.

2. Nothing contained in this Lease shall operate to delay or prevent a termination of Federal trust responsibilities with respect to the Leased Premises by the issuance of a fee patent or otherwise during the term of this Lease; however, such termination shall not serve to abrogate this Lease. Lessor and Lessee, and its surety or sureties, shall be notified of any such change in the status of the land.

3. Lessee agrees that it will not use or cause to be used any part of the Demised Premises for any unlawful conduct or purpose.

17.16: Lessor's Assistance to Lessee's Operations

1. Lessor agrees to grant Lessee the right to make beneficial use of water rights which Lessor may enjoy as owner of the Demised Premises in amounts reasonably necessary for the operation

97-001-279

of the intended self-storage facilities, but all costs associated with the use of such water, including but not limited to exploration, drilling, conveyance, transportation and application and permit fees, shall be borne by Lessee.

2. Lessor agrees that during the term of this Lease, and any extensions thereof, it will not grant to any other person or entity permission to construct or operate, directly or indirectly, on lands owned by Lessor, any self-storage business substantially similar to the self-storage business contemplated by this Lease within five (5) miles of the Demised Premises.

17.17: <u>Employment of Tribal Members</u>

Lessee agrees to make reasonable efforts to employ members of the Washoe Tribe of Nevada and California during all phases of construction of the contemplated self-storage facilities and for management of the operation after construction.

17.18: <u>Tax Benefits for Operating on Tribal Lands</u>

Lessee and Lessor recognize certain tax benefits granted to Lessee by the Internal Revenue Service in the form of accelerated depreciation and credits for the hiring of Tribal members. Lessee shall be entitled to such benefits without any obligation to compensate Lessor therefor.

97-001-279

## ARTICLE XVIII

## ARBITRATION

18.01: <u>American Arbitration Association</u>

If any controversy shall arise between the parties with respect to any of the matters set forth in this Lease and such dispute shall not be resolved by the parties within thirty (30) days after either of the parties shall notify the other of its desire to arbitrate the dispute, then the dispute shall be settled by arbitration in accordance with the rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The arbitration shall be a panel of three (3) arbitrators, one of whom must be an attorney at law actively engaged in the practice of his profession for at least ten (10) years, except in those cases where the issue to be decided by the arbitrators involves market values, rental rates or other property valuation matters, in which instance the arbitrators submitted for selection by the association shall be certified as members of the American Institute of Real Estate Appraisers. The arbitrators shall have no power to modify any of the provisions hereof and their jurisdiction is limited accordingly. Each party hereby consents to the entry of judgment

97-01-2679

by any court having jurisdiction in accordance with the decision of the arbitration panel. No change in the commercial arbitration rules of the Association which would deprive a party of the right to be represented by counsel, to present evidence, or to cross-examine witnesses presented by the other party shall be effective in any arbitration proceeding arising out of this agreement.

The parties may conduct discovery including but not limited to depositions, requests for admissions, production of documents, interrogatories and inspections in any such arbitration proceeding.

## ARTICLE XIX

## EXECUTION, RECORDING AND INCORPORATION BY REFERENCE

19.01: Recording

Neither party shall record this Lease without the written consent of the other party; however, upon the request of either party, the other party shall join in the execution of a memorandum or "short form" of this Lease for the purpose of recordation. The memorandum or short form shall describe the parties, the Demised Premises and the term of this Lease and shall incorporate this Lease by reference.

672-001-97

19.02: Counterparts

This Lease, consisting of 86 pages, plus Exhibits "A", "B", "C", "D", "E" and "F" has been executed by the parties in separate counterparts, each of which shall be deemed to be an original copy.

19.03: Execution

This Lease has been executed by the parties on the date first above written at the offices of the Washoe Tribe of Nevada and California.

96-01-279

**LESSOR:**

WASHOE DEVELOPMENT ENTERPRISES

ADDRESS: 919 Highway 395 South
Gardnerville, NV 89410

By: [signature]
Whitney Brown,
Chairman

**LESSEE:**

CARSON VALLEY/TAHOE SELF-STORAGE, L.L.C.

ADDRESS: P.O. Box 2010
Stateline, NV 89449

By: [signature]
Mark L. Michelsen
[Member resolution authorizing execution attached hereto.]

LEASE APPROVAL PURSUANT TO 25 CFR, PART 162

This lease is approved by the Bureau of Indian Affairs, Secretary of Interior, and the payment of all sums due and owing the Washoe Tribe under the provisions of this lease are to be made to the Washoe Tribe at 919 Highway 395 South, Gardnerville, Nevada 89410, and the Secretary hereby waives the provisions that said payments be made to the Bureau of Indian Affairs.

If any dispute should arise between the interpretation or implementation of the lease and the applicable rules and regulations in 25 CFR Part 162, the Code of Federal Regulations shall prevail.

Secretary of the Interior

APPROVAL

Bureau of Indian Affairs
Western Nevada Agency
1677 Hot Springs Road
Carson City, Nevada 89706

ADDRESS

Robert Hunter

Robert Hunter, Superintendent

12-18-96

DATE

97-100-279

"209 DM 8, Secretary's Order Nos. 3150 and 3177, Amendment No. 1 and 10 BIAM Bulletin 13, as amended, and the Addendum to 10 BIAM dated, June 09, 1969."

Resolution No. 96-WTC-60

# RESOLUTION OF THE GOVERNING BODY OF THE WASHOE TRIBE OF NEVADA AND CALIFORNIA

WHEREAS, the Washoe Tribe of Nevada and California is organized under the provisions of the Indian Reorganization Act of June 18, 1934 (48 Stat. 594) as amended, to exercise certain rights of home rule and be responsible for the general welfare of its membership; and

WHEREAS, the Washoe Tribe of Nevada and California desires to promote its economic self-determination and to advance its economic development with business ventures on Tribal land; and

WHEREAS, on September 9, 1994, the Tribal Council did review and approve the proposal by Mr. Mark Michelsen to enter into a long-term ground lease with the Tribe for the purpose of constructing and developing a self-storage business on Tribal lands; and

WHEREAS, the Washoe Development Enterprise has completed its review of the proposal and all steps necessary for approval of the proposal have been completed and the Board of Directors of the Washoe Development Enterprise has approved for execution by the Chairman of its Board of Directors a ground lease by and between the Washoe Development Enterprise and Carson Valley/Tahoe Self-Storage, L.L.C., for a site commonly known as Plymouth Road #1; and

WHEREAS, The Washoe Development Enterprise pursuant to Article VIII, paragraph 9 of its Charter does enjoy the authority to enter into such lease.

NOW THEREFORE BE IT RESOLVED THAT the Washoe Tribe of Nevada and California hereby approves the ground lease by and between the Washoe Development Enterprise and the Carson Valley/Tahoe Self-Storage, L.L.C., dated August 28, 1996.

SIGNED:

A. BRIAN WALLACE, CHAIRMAN

RUSSELL MCDONALD

672-001-97

JACQUELINE STEELE, VICE-CHAIR

BENNY MILLS

LENORA KIZER

DOROTHY MCCLOUD

BERNADETTE NIETO-MARKUSSUN

CLAUDIA ANN WADE

JACK MALONE

PHILLIP BENNETT

KATHIE WYATT

ROBERTA JONES

CERTIFICATION

It is hereby certified that the Washoe Tribal Council is the governing body of the Washoe Tribe of Nevada and California composed of twelve (12) members of whom 8 have executed the foregoing signature resolution pursuant to the authority contained in Article VI Section 1(h) of the Amended Constitution and Bylaws of the Washoe Tribe of Nevada and California.

9-5-96
DATE

CAROLYN KENTON
SECRETARY/TREASURER
WASHOE TRIBAL COUNCIL
WASHOE TRIBE OF NEVADA & CALIFORNIA

672-001-97

## Property Description

Up to 14.1 acres located in R20E, T14N, Section 18, NE 1/4 and NW 1/4 of the SE 1/4, starting from the southwest property boundary corner point-of-beginning, and proceeding north along the quarter section line for approximately 2,019 feet, North 0 deg, 2' 46" West, thence approximately 656 feet, South 46 deg. 56' 59" East, to the NDOT right-of-way, thence 1,617 feet, South 11 deg, 57' 5" West, on the NDOT right-of-way, and 154 feet, South 89 deg, 55' 34" West back to the point-of-beginning.




672-001-97

# EXHIBIT "B"

## PROMISSORY NOTE

FOR VALUE RECEIVED, THE WASHOE DEVELOPMENT ENTERPRISE, of ____________, promises to pay to CARSON VALLEY/TAHOE SELF STORAGE, a Limited Liability Company, of ____________, or order, or, at the option of the legal holder of this Note, at such other place as legal holder shall designate in writing, in coin or currency which at the time of payment shall be legal tender, the sum of __________ DOLLARS ($____), with interest thereon on an adjustable rate basis equal to the prime rate (as determined by Bank of America NT&SA San Francisco) but in no event shall the interest rate be lower than Seven Percent (7%) per annum or greater than Twelve Percent (12%) per annum. Principal and interest shall be paid in monthly installments of principal and interest as if fully amortized over fifteen (15) years with all unpaid principal and accrued interest, if any, due _________ (Ten years from date of note).

If any installment is not paid within ten (10) days of the due date, there shall be a late charge of ten percent (10%) of the installment due.

The undersigned maker promises and agrees in the event it shall make a general assignment for the benefit of creditors or be adjudged bankrupt, or shall be in default in the making of any payments of principal or interest hereunder, then upon the happening of any of such events, the whole sum of principal shall become forthwith due and payable, although the time of maturity as expressed in this Promissory Note shall not have arrived. The term "default" as used herein shall mean the failure of maker to make payments of principal and interest for five (5) days after the holder has given maker written notice of its failure to make any payment when due. Such notice may be delivered personally to maker or deposited in the United States mail, postage prepaid, certified return receipt requested, and addressed to maker at its address above stated. In the case of personal delivery, service shall be deemed completed upon delivery. In the case of mailing, service shall be deemed complete one (1) day after the date of mailing.

This Note is secured by a Deed of Trust (real property interests) and Security Agreement (personal property interests) of even date herewith. Together said security interests shall hereafter be referred to as "Security".

In the event that the Security securing this note is sold, or if it is agreed that it will be sold, conveyed, or alienated by the payor, or by operation of law or otherwise, all obligations secured by this Note, irrespective of the maturity dates expressed herein, at the option of the holders and without demand or notice, shall become immediately due and payable.

Payor reserves the right to prepay the entire principal balance of this Note at any time without penalty or additional interest.

The undersigned waives presentment for payment, demand, notice, protest and notice of protest, diligence and nonpayment of this note.

The undersigned promises and agrees that, in case any suit or legal or equitable action is instituted to collect this Note, or any portion thereof, to pay all costs and expenses and attorneys fees in said suit or action, the same to be included in any judgment obtained on this Note.

THE WASHOE DEVELOPMENT ENTERPRISE

By:______________________________

672-001-97

EXHIBIT "C"

## ESTIMATED INCOME/EXPENSE FOR CARSON/TAHOE SELF-STORAGE

INCOME

RENTAL INCOME
MISC. CHARGES

TOTAL INCOME

EXPENSES (STABILIZED OPERATING EXPENSES)

ACCOUNTANT
ADVERTSING
DUES & SUBSCRIPTIONS
INSURANCE
LICENSES
LOCK PURCHASES*
OFFICE SUPPLIES
OUTSIDE SERVICES
PAYROLL
PEST CONTROL
POSTAGE
PRINTING
REPAIRS/MAINTENANCE
SECURITY SERVICE
SWEEPING SERVICE
MISCELLANEOUS SVCS.
TRASH REMOVAL
UTILITIES: ELECTRIC
UTILITIES: GAS
UTILITIES: TELEPHONE
WATER
SEWER

TOTAL EXPENSES

* PAYMENTS TO LESSOR UNDER THE LEASE ARE EXCLUDED FROM EXPENSES.

672-001-97

EXHIBIT "D"

[INSERT APPROVED PLANS]

97-100-276


Douglas - Washoe
Self - Storage
Preliminary - Rough Layout
Plymouth Site
Plymouth Drive
Plymouth
River - Drainage
Hwy 395
To Carson
NDOT
ROW
1360'
60'
1320'
130'
500
550'
260'
710'
22,000 ϕ
12,400 ϕ
Footage 45,000 ϕ
Probable = 30,000 ϕ
97-100-279



PTN.SEC.18,T14N,R20E MDB&M
TRA-30-500
34-350
30-330
Assessor s Map—Bk.13,Pg.19
County of Douglas, Nevada
R.S. Bk. Pg. Doc.-34666 (A)
Stewart E. & Henrietta
P.M. Bk.977,Pg.1303,Doc.-13232 (B)
Harris,Carol
P.M. Bk.1277,Pg.241,Doc.-15608 (C)
Hartman,Leo
P.M. Bk.488, Pg.1215-Doc.176009 (D)
Judd, Ilene M.
EXCEPTION: TAX AREA CODE 500
EXCEPTION TAX AREA CODE NO. 330
EXCEPTION: T.R.A.-350
U.S. HWY. 395
PLYMOUTH DRIVE
TENNANT LANE
CLARK ST.
HARRIS ROAD
VISTA GRANDE BLVD.
AMADOR BLVD.
PLACER COURT
CIRCLE
SOMERSET CT.
COLOMA
WAY
DRIVE
AUTUMN COURT
INDIAN HILLS G.I.D.
29.34Ac±
53.99Ac±
32.5Ac.
32.61Ac.
32.73Ac.
111.3 Ac±
35Ac.±
Bk.21 Pg.01
R.19 E. R.20 E.
1/4 COR.
UPDATED
13-100-279
Premises. No Liability is assumed as to the sufficiency
or accuracy of the Data delineated thereon.


PLYMOUTH SITE
672-001-97
STEWART
Area = 120.42 Acres
(Incl. Homestead & Parcel A)
Parcel A
5.00 Acres
Stewart Homestead
5.00 Acres
NE 1/4 SW 1/4
1/4 Sec. Line
1/4 Sec. Line
N 89° 50' 43" E ~ 1321.20
S 89° 50' 43" W ~ 724.00
N 89° 50' 43" E ~ 724.00
N 89° 55' 34" E ~ 1320.59
N 89° 45' 51" E ~ 1321.81
N 0° 02' 46" E ~ 3972.18
1324.06
857.37
1322.19'
853.50'
466.69
Easement
60' Road
Carson City
U.S. 395
Hobo Hot Springs
gully
Set in side of gully
24
18


END VIEW
HWY
ROW
12' GRAVEL
25' DRIVE
110' BLDG
25' DRIVE
110' BLDG
2:1
1.5:1



672-001-97

2 HR FIREWALL

# UNIT LAYOUT PLAN

SCALE: 1"=30'-0"




SAMPLE "A" OF MANAGER'S UNIT
BEDROOM (2)
LIVING ROOM 160 SF
KITCHEN
120 SF
MASTER BEDROOM 110 SF AREA
DRYER
WASHER
FURNACE
REFRIG
RANGE
PANTRY
SHELVES
TUB
WH
100A PANEL
GFI RECEPTACLE IN CRAWL SPACE
4" TYP. EXT. WALLS
16" WALL
52'
13'-3 1/16"
10'-2"
8'-2"
13'-4"
10'-10 3/16"
7'-4 7/8"



DRAWN BY: GARNET
DATE: 5 23 90
TITLE: FLOOR PLAN
USE: 400 S1GO NEV UBC
GLEN RIVER INDUSTRIES, INC.
DRAWING NO.
WARNING
Local building code requirements may pre-empt State requirements.
All State approved plans must be reviewed and approved by local building authority.
All site installations and materials shall conform to applicable local building code requirements.
APPROVED
MAY 29 1990
Authorized Signature
B – HALF
A – HALF
LANDINGS REQUIRED AT EXTERIOR DOORS NOT MORE THAN 7 1/2" BELOW FLOOR LEVEL
OFFICE
CUSTOMER AREA
ONE HOUR FIRE WALL W/ DOOR 28 RATED
KITCHEN
UTILITY
OFFICE
BATH
STOR
HOSE BIBS WITH VACUUM BREAKERS
DESIGN: UBC CODE R3 B2
40 PSF ROOF LIVE LOAD
32 PSF HORIZ. WIND, (90 MPH. EXPOSURE C)
40 PSF FLOOR LIVE LOAD 2x8 FLOOR JOISTS
OFFICE 50 PSF FLOOR LOAD
SEISMIC ZONE 3
ON SITE WORK TO BE INDICATED ON AN N.L.E.A FORM AT TIME OF CONSTRUCTION
MIN. ATTIC VENT AREA = 553 S.I.
26-100-279
SAMPLE "B" of MANAGER/CARETAKER - UNIT




672-001-97

WASHOE TRIBE — MICHELSEN GROUP

HADDAN ENGINEERING

CARSON VALLEY/TAHOE SELF STORAGE

EXHIBIT "E"

[INSERT COMPLETED B.I.A. ASSESSMENT STATEMENT]

672-001-97

# FINDING OF NO SIGNIFICANT IMPACT

The Bureau of Indian Affairs, Western Nevada Agency, Branch of Real Estate, proposes to approve a business lease between the Washoe Development Enterprise and the Carson Valley/Tahoe Self-Storage for the purpose of building and operating a facility consisting of individual units for rent to the public for the purpose of storing personal property, commonly called a "self-storage" unit.

Based on the attached Environmental Assessment, it has been determined that the proposed construction of a self-storage unit building will not have any significant adverse impacts on the quality of the human environment, therefore, an Environmental Impact Statement is not required.

Reasons supporting this finding is as follows:

1. No loss of wildlife habitat or wildlife.
2. Will not impact any known threatened or endangered species.
3. Will not impact cultural resources.
4. Construction will follow state laws for Air Quality standards.
5. Proposed use is compatible with land resources.
6. Project will positively affect Socioeconomic Conditions.
7. Transportation issues have been addressed.
8. Public Health, Safety, and Fire Hazards are addressed.

This FONSI is contingent on the use of an appropriate storm drainage design and dumpster facilities being added to the project.

12-18-96
Date

Superintendent
Western Nevada Agency

97-001-279

# WASHOE PLANNING DEPARTMENT

## LAND USE PROJECT REVIEW AND ENVIRONMENTAL ASSESSMENT

## COVER SHEET

1. APPLICANT

Mark Michelson & Jim Fondren - Michelsen Construction
P.O. Box 646
Zephyr Cove, NV 89448
(702) 588-6513

2. PROJECT SITE

#1 - Silverado Parcel, west side Hwy 395 T14N R 20E, Section 18
#2 - Stewart Ranch Parcel, adjacent to Hobo Hot Springs Road, east of white gate T14N, R 20E, Section 19

3. BRIEF DESCRIPTION OF PROJECT

Applicant proposes construction of 30,000 to 40,000 square feet of self storage units at Site #1, with expansion to 100,000 square feet at Site #2. Acutal amount of land is not known until detailed plan is developed. Manger's units, parking, driveways, and related facilities would be constructed at both sites. Applicants have five other storage unit complexes in operation in region and have been truned down by Douglas County for project in Silverado vicinity. Project would be entirely financed by applicant. Tribal cooperation is requested to obtain water and sewer service, and possibly an NDOT right-of-way encroachment permit.

4. ALTERNATIVES CONSIDERED

Alternative 1 is as proposed. Alternative 2 is no project. Alternative 3 is a location off of Tribal land which was rejected by Douglas County Commissioners at the zone change/special use permit application stages because other higher uses were believed possible for the land. Alternative 4 is another location on Tribal land. Applicant's market analysis indicates a need to be close to population center of south Carson area for viability, alsoneeds visibility from major road for at least one portion of project. No project was ruled out because it did not generate revenue for the Tribe. The selected site is favored because there are few other feasible uses for the small, narrow parcel proposed for Site #1, it has highway visibility, and is close to population centers.

97-001-279

5. REVIEW SUMMARY

The storage units appear to be a good use for Site # 1, which has severe constraints due to size, narrow shape, storm drain channels, and utility easements. Site # 2 is needed for economic viability, and will not rule out other higher uses of adjacent lands.

Drainage is the most significant issue on Site #1, and any modifications will affect the parcel on both sides of the highway. The Tribe should stay fully involved in any proposed drainage modifications, and the applicant should employ competent professional expertise to design any changes. Design should be completed and approved before construction begins.

Sewer and domestic water connections to a community system ( Indian Hills) is preferable to on-site.

While visibility is important, so is compatability with the neighborhood character. The Tribe should review detailed design information prior to start of construction, including architectural design, fencing, color schemes, and signage.

6. ACTION RECOMMENDED

Approval, with conditions.

7. ENVIRONMENTAL FINDING RECOMMENDATION:

☐ Categorically Excluded ☑ No Significant Impact (W/Mitigation) ☐ Significant Impact.

8. PREPARED BY:

Diane M. Dorman
Tribal Planner

# ENVIRONMENTAL CHECKLIST

| | Potentially Significant Impact | Potentially Significant Unless Mitigated | Less Than Significant Impact | No Impact | Positive Impact |
|---|---|---|---|---|---|
| **1. LAND RESOURCES** | | | | | |
| Land Use Compatibility (3.1) | | | X | | |
| Agricultural Lands of Local Importance (3.2.1) | | | | X | |
| Topography/Unique geologic features (3.13.1) | | | X | | |
| Storm Drainage (3.3.5) | | X | | | |
| Soils | | | | X | |
| Erosion & Sedimentation (3.8) | | | X | | |
| Mineral Resources | | | | X | |
| **2 WATER RESOURCES** | | | | | |
| Wetland Resources (3.18.5) | | | | X | |
| Irrigation Ditches (3.18.1) | | | | X | |
| Water Use Efficiency/Conservation (3.18.2) | | | X | | |
| Water Quality Degradation (3.18.4) | | | | X | |
| Discharge to Surface Water | | | | X | |
| Erosion & Sedimentation | | | X | | |
| Groundwater Quality | | | X | | |
| Water Rights and Supply (3.18.3) | | | X | | |
| Development in stream or wash channel (3.3.1) | | | X | | |
| **3. AIR RESOURCES** | | | | | |
| Air quality standards | | | | X | |
| Odors, Emissions (3.1) | | | | X | |
| Dust, wind erosion (3.8) | | X | | | |

97-001-279

| | Potentially Significant Impact | Potentially Significant Unless Mitigated | Less Than Significant Impact | No Impact | Positive Impact |
|---|---|---|---|---|---|
| **4. LIVING RESOURCES** | | | | | |
| Endangered, threatened or rare species/habitats? | ☐ | ☐ | ☐ | ☐ | ☐ |
| Wildlife habitat/migration corridors (3.6) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Vegetation (3.13.1-2) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Ecosystems & Biologic Communities | ☐ | ☐ | ☑ | ☐ | ☐ |
| **5. CULTURAL RESOURCES** | | | | | |
| Historic Properties (3.5) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Prehistoric (Archeological) Resources (3.5) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Other culturally significant properties (3.5) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Contemporary cultural practices areas (3.5) | ☐ | ☐ | ☐ | ☑ | ☐ |
| **6. SOCIOECONOMIC CONDITIONS** | | | | | |
| Employment and Income | ☐ | ☐ | ☐ | ☐ | ☑ |
| Demographic Trends | ☐ | ☐ | ☐ | ☑ | ☐ |
| Attitudes, Expectations, Lifestyle, Values (3.1) | ☐ | ☐ | ☐ | ☐ | ☑ |
| Community Infrastructure (3.1) | ☐ | ☐ | ☐ | ☑ | ☐ |
| **7. RESOURCE USE PATTERNS** | | | | | |
| Agricultural Lands -existing uses (3.2) | ☐ | ☐ | ☐ | ☑ | ☐ |
| Hunting, Fishing, Gathering | ☐ | ☐ | ☐ | ☑ | ☐ |
| Timber, Forestry or Woodland uses | ☐ | ☐ | ☐ | ☑ | ☐ |
| Mining | ☐ | ☐ | ☐ | ☑ | ☐ |
| Recreation (3.14) | ☐ | ☐ | ☐ | ☑ | ☐ |
| Utilities and service systems | ☐ | ☐ | ☑ | ☐ | ☐ |

672-001-97

| | Potentially Significant Impact | Potentially Significant Unless Mitigated | Less Than Significant Impact | No Impact | Positive Impact |
|---|---|---|---|---|---|
| **8. TRANSPORTATION** | | | | | |
| Vehicle trips and congestion (3.10) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Safety - access onto regional roads (3.10.6-10) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Non-vehicular transportation (3.10.11) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Parking (3.11.1) | ☐ | ☐ | ☑ | ☐ | ☐ |
| New roads (3.10.) | ☐ | ☐ | ☐ | ☐ | ☑ |
| Right-of-ways/planned routes (3.1) | ☐ | ☐ | ☐ | ☑ | ☐ |
| **9. OTHER VALUES** | | | | | |
| Sound and Noise (3.1) | ☐ | ☐ | ☐ | ☑ | ☐ |
| Solar Access (3.16) | ☐ | ☐ | ☐ | ☑ | ☐ |
| Wilderness | ☐ | ☐ | ☐ | ☑ | ☐ |
| Solid Waste Disposal (3.17.3) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Aesthetic/Views/Glare (3.1) | ☐ | ☐ | ☑ | ☐ | ☐ |
| **10. HAZARDS** | | | | | |
| Flood Plain -100 year (3.3.2) | ☐ | ☐ | ☐ | ☑ | ☐ |
| Seismic Hazard (3.4) | ☐ | ☐ | ☐ | ☑ | ☐ |
| Fire (3.9.1) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Public Health and Safety (3.9) | ☐ | ☐ | ☑ | ☐ | ☐ |
| Hazardous Materials Generated, Stored or Transported (3.4, 3.9 and other) | ☐ | ☐ | ☑ | ☐ | ☐ |

672-001-97

# ENVIRONMENTAL ASSESSMENT REVIEW AND CONSULTATION CHECKLIST

*Indicate below with an "X" any regulations applicable to selected alternative and identify consultation and/or documentation. See discussion narrative for further information on compliance.*

| | Not Applicable | Applicable, In Compliance | Not in Compliance | Consult Required |
|---|---|---|---|---|
| **1. Cultural Resources** | | | | |
| Archeological Resources Protection Act<br>Survey Complete - No Excavation or Removal | ◊ | ✓ | ◊ | ◊ |
| National Historic Preservation Act | ◊ | ◊ | ◊ | ✓ |
| American Indian Religious Freedom Act<br>Contact - Cultural Coordinator 10/26/94 | ◊ | ✓ | ◊ | ◊ |
| **2. Water and Related Land Resources** | | | | |
| Safe Drinking Water Act of 1974<br>No Public Water Supplies | ✓ | ◊ | ◊ | ◊ |
| Flood Disaster Protection Act of 1973<br>Ref. WTPMP, 1994 | ✓ | ◊ | ◊ | ◊ |
| Coastal Zone Management Act of 1972<br>Field - No Coastal zone | ✓ | ◊ | ◊ | ◊ |
| Floodplain Management (Exec. Order 11988)<br>Ref. Parcel Master Plans (WTPMP, 1994) | ✓ | ◊ | ◊ | ◊ |
| Wetlands Protection (Exec. Order 11990)<br>Ref. WTPMP, 1994 | ✓ | ◊ | ◊ | ◊ |

97-100-279

| | Not Applicable | Applicable, In Compliance | Not in Compliance | Consult Required |
|---|---|---|---|---|
| Clean Water Act<br>Note Conditions of Approval<br>Septics, Discharges Prohibited | ◊ | ✓ | ◊ | ◊ |
| Rivers and Harbors Act of 1899<br>Ref WTPMP, 1994 – No navigable waters | ✓ | ◊ | ◊ | ◊ |
| Federal Power Act<br>No Power Generation | ✓ | ◊ | ◊ | ◊ |
| Water Resources Planning Act of 1965<br>No recreational or other water bodies. | ✓ | ◊ | ◊ | ◊ |
| Other | ◊ | ◊ | ◊ | ◊ |

**3. Wildlife**

| | Not Applicable | Applicable, In Compliance | Not in Compliance | Consult Required |
|---|---|---|---|---|
| Endangered Species Act | ◊ | ◊ | ◊ | ✓ |
| Fish and Wildlife Coordination Act | ◊ | ◊ | ◊ | ✓ |
| Fish and Wildlife Conservation at Small Watershed Projects | ✓ | ◊ | ◊ | ◊ |

97-001-279

| | Not Applicable | Applicable, In Compliance | Not in Compliance | Consult Required |
|---|---|---|---|---|
| **4. Marine Resources** | | | | |
| Deepwater Port Act | ✓ | ◊ | ◊ | ◊ |
| Ocean Dumping | ✓ | ◊ | ◊ | ◊ |
| Marine Protection, Research and Sanctuaries Act | ✓ | ◊ | ◊ | ◊ |
| *FIELD: No marine impacts* | | | | |
| **5. Air Quality** | | | | |
| Clean Air Act | ◊ | ✓ | ◊ | ◊ |
| *Construction phasing per State law* | | | | |
| **6. Misc.** | | | | |
| Intergovernmental Coordination Act of 1968 | ✓ | ◊ | ◊ | ◊ |
| Surface Mining Control and Reclamation Act of 1977 | ✓ | ◊ | ◊ | ◊ |
| Resources Conservation and Recovery Act of 1976 | ✓ | ◊ | ◊ | ◊ |
| *No Hazardous Materials or landfilling* | | | | |
| Noise Control Act of 1972 (as amended) | ◊ | ✓ | ◊ | ◊ |
| *REF - APPLICATION - NO UNUSUAL or loud, excessive NOISE generated* | | | | |
| Other | | | | |

672-001-97

# PROJECT REVIEW

The following questions will be reviewed by Planning Staff with input from other Tribal and outside professional sources when indicated. Applicants may be asked to supply documentation answering some questions, and Planning staff can assist to identify likely questions at a pre-proposal meeting.

## 1. LAND RESOURCES

### A. Compatibility

*Is the project in agreement with land use designations of Comprehensive Plan?*
*For a large, phased project, is a project master plan provided?*
*How is the project compatible with adjacent and nearby uses, both existing and proposed?*
*Does the proposed development have potential to generate negative effects on the nearby uses(i.e. odor, safety. noise, glare, traffic, pollution)?*
*If yes, can the effects be mitigated?*

The 1994 Master plans identify both parcels as moderate to good development potential for commercial uses, as is proposed.

1985 CLUP also identified potential of commercial development due to proximity of subdivisions, and designates Site #1 as highly suitable for development. This project is particularly dependent on nearby residential. Site #2 is designated as moderately suitable for development.

No conflicts identified with Tribal Goals and policies in either plan

Adjacent uses at Site #1 are residential. Increased traffic on Plymouth Drive from Highway 395 is expected, but would not travel past any residential area prior to entering the facility. This area in the Draft Douglas County Master Plan is designated Single Family Residential - 3 (3 units per acre) which is moderate density, and a small section of Rural Estates, 1 acre lots. Current zoning is at slightly lower densities. A well designed and well managed facility is not expected to raise additional compatibility concerns from neighbors.

Site #2 traffic will pass adjacent to a larger RE-1 area in the Draft DC Master Plan, with existing Agricultural Residential/1 acre zoning. Site #2 also borders the Jacks Valley Wildlife Management Area, but the nearby residential densities and limited water do not make this a sensitive wildlife zone.

97-001-279

Both sites are within a proposed "Urban Service Area" in the Draft DC Master Plan, so it appears that this general area within the County is expected to be fairly densely developed with appropriate infrastructure improvements.

B. Agricultural Lands

*Will the project impact prime agricultural lands or uses?*

Specific sites are not utilized for grazing or other agricultural operations. Proposed use does not have any indicated impact on existing agricultural land uses. Development in either location will not impact existing or proposed agricultural operations.

C. Topography/Unique Geologic or Physical Features

*How would the topographic relief be altered?*

D. Storm Drainage

*Is an appropriate design if impacts are projected?*

Storm drainage is a significant issue on Site #1, which has a natural channel on the north end. Recently, the flow of this channel has been severely altered by developments to the north and west. The applicant is very aware and concerned with addressing this problem. Approving a design should be a condition of approval.

E. Soils/ Type, Limitations, Erosion and Soil Loss

F. Mineral Resources

No known mineral resources are located in these parcels or expected to be present, with the exception of fill dirt materials which is desired from other nearby locations.

97-10-0279

## 2. WATER RESOURCES

A. Physical Impact on Water Bodies - Wetlands, Irrigation Ditches, Stream Channels

*Are potential wetlands identified in this area? Is a delineation indicated?*
*Are any stream channels, washes, or irrigation ditches impacted?*

CLUP does not identify potential wetlands on these parcels, based on soils and absence of wetland vegetation. An intermittent drainage borders the #1 parcel, but the flow channel will not be altered by the project. The Carson River main branch, is approximately 1.5 miles to the east of the parcels, but project will not have direct impacts.

B. Water Use/Efficiency

*What are the water demands for this development?*

The water demand will consist primarily of the uses by the two residential manager units. Some additional landscape and maintenance uses are expected, but minimal beyond the residential.

C. Water Quality - Surface Discharge, Sedimentation, Groundwater Quality

*Will the development create erosion or sedimentation greater than pre-development conditions?*
*Will any substances, including sewage, be discharged which may reach either ground or surface water sources?*

Sewage disposal/septic systems, if connections to IHGID is not possible, should be constructed to be comparable with surrounding County standards. No surface discharge is allowed.

Erosion and increased runoff, considering the drainage pattern through parcel #1, is a significant concern. It can be mitigated through adequate site design. Applicant proposes infiltration trenches and a detention pond. On-site storm water management is preferable, but if not possible, drainage could be resolved in plans for east side of Hwy 395 at a later date.

F. Water Rights

*Are appropriate water rights available for this project?*
*Is any potential harm identifiable to existing Washoe rights?*

Due to unresolved legal questions between the state and Indian Tribes, use of an independent groundwater wall is not desirable, although the Tribe does not believe its rights would be harmed by such a use. No water rights may be transferred to IHGID in exchange for a connection.

97-001-279

## 3. AIR RESOURCES

### A. Standards

No emmissions will impact air quality standards.

### B. Dust, Wind Erosion, Smoke, Odors, etc.

*Are air quality impacts expected? Dust? Smoke? Emissions?*
*If so, is mitigation possible?*

Dust can be mitigated by limiting area cleared and under construction at any time to less than four acres, and by landscaping grounds and maintaining road adequately.

## 4. LIVING RESOURCES

### A. Endangered and Threatened Species or Habitats

Response requested from US Fish and Wildlife. Both parcels have been extensively disturbed and adjoin urban uses, so no species are suspected.

### B. Wildlife Habitat/Migration Corridors

The proximity of the adjacent wildlife management area is a consideration, but the urbanization of other adjacent lands limits the suitability of these two parcels for wildlife habitat. Previous documentation by the Nevada Fish and Wildlife Division (1980's - although no jurisdiction here) indicates no presence of threatened or endangered species. Applicant has requested reverification on these two specific parcels.

### C. Vegetation

*Are native plants and/or low water landscapes utilized?*
*Will potentially harmful species be introduced?*

These parcels lie within a Big Sagebrush community, including the big sagebrush (artemisia tridentata), desert peach, rabbitbrush, cheat grass, Russian thistle, and tumbling mustard. A landscape design is not yet available, but use of native species and xeriscape is enouraged.

### D. Ecosystems and Biologic Communities

The urban encroachment and proximity to highway limit these parcels value for ecosystems or biologic communities.

97-100-279

## 5. CULTURAL RESOURCES

A. Historic Properties
B. Prehistoric Resources
C. Other Resources
*What cultural sensitivity zone has been identified for the area?*
*Are specific cultural resources going to be impacted by the development?*
*Has a site survey been completed?*

Site #1 is considered low to moderate sensitivity for cultural resources, #2 , as part of the Stewart Ranch, is considered high sensitivity. Applicant contracted with Intermountain Research, a qualified firm, to complete a cultural resource survey, which is included by reference. Tribal Cultural Resources Coordinator confirms no impact is expected, and if any materials are uncovered during construction, work should cease immediately for further consultation with Coordinator or Tribal Chairman.

While prehistoric campsites and Washoe ancestral sites are known within a one mile radius, no evidence was found on the parcels of significance. Site #2 is believed to be the site of the Clark Sinclair or Pony Saloon, in operation until 1915, adjacent to the Emigrant Trail (Hobo Hot Springs Road) , and some historic artifacts remain. Due to the level of disturbance, and the absence of structural remains, this site is not considered eligible for the National Register and not expected to offer much historic data.

## 6. SOCIOECONOMIC CONDITIONS

A. Employment and Income
B. Demographic Trends
C. Attitudes, Expectations, Lifestyle, Values
D. Community Infrastructure

The project will add jobs in management and maintenance, which the applicant has agreed to exercise Indian preference for. Temporary construction jobs should also be available. No impact is expected on demographic trends, as it is a small, non-residential development. These parcels are within areas most tribal members consider desirable for development, without much other cultural attachment.

## 7. RESOURCE USE PATTERNS

A. Agricultural Lands
*Does the development have potential to limit the operation of existing agricultural uses?*

97-001-279

B. Hunting, Fishing, Gathering
C. Timber, Forestry, Woodlands
D. Mining
E. Recreation

The parcels are currently vacant, and resources are not currently utilized for agriculture, hunting or gathering, forestry, mining or recreation. The proximity to urban development and small size rules out most recreational uses.

F. Utilities and Service Systems
*Will water and sewer be provided by community or individual systems?*
*If individual, will the water supply qualify as a public water system?*
*Are connection costs covered or provided for?*
*Are electric and other needed utilities available on site?*

The project proposes use of community water and sewer available from Indian Hills General Improvement District. A formal request has not yet been made, pending approval of application. Connection to IHGID should be sought for sewer and water service, connection fees paid by applicant

**8. TRANSPORTATION**

A. Vehicle Trips and Congestion
*What is the expected traffic volume and patterns on these roads?*

The applicant needs to provide traffic figures.

B. Safety and Access
*How will public roads be accessed?*
*Will congestion or safety hazards result from this project?*

Plymouth Road will be accessed near Hwy 395. Need to determine if a County Right of Way Occupancy permit is required for establishment of new access. With construction of the proposed stoplight, this is expected to remain a safe intersection.

C. Nonvehicular Transportation
Should other modes of transportation be accommodated, i.e. pedestrians or bicycles?
Is access adequate for persons with disabilities?

Due to the nature of the business, little pedestrian or non-vehicular traffic is expected, nor is pedestrian traffic expected at the Plymouth Road intersection.

672-001-97

D. Parking

*What are the requirements anticipated for employee, service and customer parking?*
*Is handicapped parking required and provided?*

Three public parking spaces per site is proposed, one handicapped. Two additional sites are provided for manager units. This is considered adequate. Stalls should measure at least 10x18.

E. New Roads

*Are new roads proposed? Road improvements?*

Applicant has agreed to improve and maintain the tribal portions of Hot Springs Road directly serving his projects. If any paving is done, it should be comparable to Douglas County standards

F. Right-of-ways, Planned Routes

*Are any planned routes altered, impacted?*

Additional road improvements at Plymouth will be made with Las Vegas Paving project, including stop light at Hwy 395. Traffic projections are needed to determine road adequacy to Site #2..

**9. OTHER**

A. Sound and Noise

No unusual sounds or excessive noise generated by project.

B. Solar Access

No impact

C. Wilderness

Not applicable.

672-001-97

D. Solid Waste
*How will solid waste disposal be provided?*
*Will recycling methods be established?*

Applicant should provide adequate dumpster facilities for renters to dispose of material from units, with regular pick up to prevent overflowing. Evidence of trash service contracts should be provided if requested.

E. Aesthetic Qualities, Views, Glare

Site and signage should be designed to be aesthetically appealing and in keeping with a residential area to mitigate neighbors' potential concerns. Visual screening may be desireable as well. A site plan should be submitted to the Planning Department.

F. Density
*What density is proposed? Are other densities feasible?*

Site #1 density proposed is up to 40,000 square feet of buildings, and manager unit on 8.27 acres of useable space within an approximately 11 acre parcel. Existing right-of-ways, wash, and steep slopes render the remaining areas unsuitable for development.

Site #2 proposes around 60,000 square feet of buildings within an approximate 10 acre site.

Proposed density is in keeping with surrounding moderate densities proposed in Draft DC Master Plan. Applicant states that 100,000 total square footage is optimal for economic viability.

**10. HAZARDS**

A. Flood Plain

Site #2 borders the Carson River flood plain to the south, but neither parcel falls within a 100 year flood plain.

B. Seismic Hazards

Genoa Fault, expected to produce earthquakes of magnitude 7.5, is approximately two miles to the west. This use does not pose any substantial risks.

97-001-279

C. Fire Hazards

*Does the development pose any special fire safety needs?*

No.

D. Public Health and Safety, Emergency Services

*What emergency services are available to the project or provided for?*

Douglas County Emergency Services Agreement should address emergency medical and fire protection, this needs to be verified as soon as signed agreement available to Planning Department. Fire potential is relatively low for metal buildings proposed, fire danger to managers unit and storage unit contents more likely, although no electricity will be provided in individual units. Site security is not addressed in proposal.

E. Hazardous Materials, Generated, Stored, or Transported

*Does the development utilize, transport, or produce any substances requiring safety precautions?*
*Does the development have potential to generate, or will it utilize, any hazardous wastes?*
*If yes, how are the materials handled and disposed of? Are there long term impacts?*

Unit agreements prohibit storage of hazardous materials or flammable materials, although it is conceivable that such unauthorized use could occur. Agreement also provides for access by Owner if hazardous uses are suspected. No hazardous materials will be generated on site.

97-001-2729

# RECOMMENDED CONDITIONS OF APPROVAL AND ENVIRONMENTAL MITIGATION

List all recommended conditions of approval. Upon review of Council, check each specifically adopted by the Council. A Tribal Officer will sign when completed and approved by Tribal Council.

| Approved | | Condition |
|---|---|---|
| ☑ | 1. | Tribal Planning review design to consider aesthetics of site design and signage. Visual screening may be desireable to adjacent residential. |
| ☑ | 2 | Traffic projections should be provided by applicant based on expected customer useage, or else determine if road is actually maintained now to adequate standard. |
| ☑ | 3. | Access at Site #1 should be coordinated with LVP improvements. |
| ☑ | 4 | Applicant, with support of the Tribe, should be responsible for obtaining access permits onto Plymouth, a Douglas County Road. |
| ☑ | 5 | Ensure storm drainage plan considers erosion and street run-off, and is designed by qualified engineer. Tribal Planning shall review and approve design prior to construction. |
| ☑ | 6 | Tribal Cultural Resources Coordinator confirms no impact expected, and if any materials are uncovered during construction, work should cease immediately for further consultation with Coordinator or Tribal Chairman. |
| ☑ | 7. | Native and drought tolerant plants should be emphasized in landscaping both for water conservation and for preserving habitat for smaller species. |

97-100-279

☑ 8. Connection to IHGID should be sought for water and sewer service, connection fees paid by applicant.

☑ 9. Septic system, if deemed necessary without connection to IHGID, should comply with surrounding County standards.

Signed ______________________ Date 9-6-96
Planner

______________________ Date 9/6/96
Tribal Officer

672-001-97

EXHIBIT "F"

## CERTIFICATE OF INSURANCE

ISSUE DATE: 06/20/95

**PRODUCER**

A to Z Insurance, Inc. of Nv.
PO Box 1190
Zephyr Cove, Nv. 89448
Phone: (702) 588-5661
Fax: (702) 588-5662

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**COMPANIES AFFORDING COVERAGE**

COMPANY LETTER A Hawkeye Security Insurance Company
COMPANY LETTER B
COMPANY LETTER C
COMPANY LETTER D
COMPANY LETTER E

**INSURED**

Michelsen Construction Company
P.O. Box 646
Zephyr Cove, Nv 89448

**COVERAGES**

THIS IS TO CERTIFY THAT POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENTS, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS, AND CONDIT[IONS OF] SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE | ALL LIMITS IN THOUSANDS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS MADE [X] OCCUR<br>[ ] OWNER'S & CONTRACTOR'S PROT.<br>[ ] | HAC2-061998/15 | 11/01/94 | 11/01/95 | GENERAL AGGREGATE | $ 2,000 |
| | | | | | PRODUCTS-COMP/OPS AGGREGATE | $ 2,000 |
| | | | | | PERSONAL & ADVERTISING INJURY | $ 1,000 |
| | | | | | EACH OCCURRENCE | $ 1,000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 50 |
| | | | | | MEDICAL EXPENSE (Any one person) | $ 5 |
| A | AUTOMOBILE LIABILITY<br>[ ] ANY AUTO<br>[ ] ALL OWNED AUTOS<br>[X] SCHEDULED AUTOS<br>[X] HIRED AUTOS<br>[X] NON-OWNED AUTOS<br>[ ] GARAGE LIABILITY | HHA7-061998/21 | 11/01/94 | 11/01/95 | COMBINED SINGLE LIMIT | $ 1,000 |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| | EXCESS LIABILITY<br>[ ] OTHER THAN UMBRELLA FORM | | | | EACH OCCURRENCE $ | AGGREGATE $ |
| A | WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY | HAC2-061998/15<br>Nevada stop gap | 12/05/94 | 11/01/95 | STATUTORY | |
| | | | | | $ 1,000 | EACH ACCIDENT |
| | | | | | $ 2,000 | DISEASE-POLICY LIMIT |
| | | | | | $ 1,000 | DISEASE-EACH EMPLOYEE |
| | OTHER | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/RESTRICTIONS/SPECIAL ITEMS

**CERTIFICATE HOLDER**

WASHOE TRIBE

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE

W.K. Kolstad [illegible]

672-001-97

**ADDENDUM #1 TO GROUND LEASE**
The Washoe Development Enterprise to
Carson Valley/Tahoe Self-Storage, L.L.C.
Plymouth Road #1

THIS ADDENDUM #1 to GROUND LEASE, hereinafter referred to as "Addendum" is made and entered into this 2nd day of October, 1996, by and between "THE WASHOE DEVELOPMENT ENTERPRISE", hereafter referred to as "Lessor", and CARSON VALLEY/TAHOE SELF-STORAGE, L.L.C., a limited liability company, of Stateline, Nevada, hereafter referred to as "Lessee".

1. **AMENDMENT**

Paragraph 2.03, subparagraph 4. of the Ground Lease between Lessor and Lessee entered into on the 28th day of August, 1996 is hereby amended in the following particulars:

*"The term 'secured by the assets of the business' as used in Paragraph 2.03, subparagraph 4., and otherwise in the Ground Lease, shall mean, without limitation, that in the event that Lessor is in default of the promissory note, the Lessee, at its option, shall immediately be entitled to a return of all assets the subject of the sale and, in the case of the real property, shall be entitled to assume possession thereof on terms consistent with the Ground Lease [except that Lessor shall not, without Lessee's consent, have the option to thereafter purchase the business].*

*In such circumstance, Lessee shall not be required to refund all or any part of any down payment, prepayment or payments made pursuant to the promissory note.*

*The remedy herein set forth shall be in addition to any other remedies which Lessee may have in law or equity.*

*Lessor agrees to execute such additional instruments and documents as may be reasonably required to give effect to Lessee's remedies hereunder or to create and perfect Lessee's security interests in the assets of the business, including but not limited to the right to assume possession of the real property utilized in said business."*

**LESSOR:**
WASHOE DEVELOPMENT ENTERPRISES

By: Whitney Brown
Whitney Brown, Chairman

**LESSEE:**
CARSON VALLEY/TAHOE SELF-STORAGE, L.L.C.

By: Mark L. Michelsen
Mark L. Michelsen
[Member resolution authorizing execution attached hereto]

97-100-279