# EXHIBIT 15

WDC Letter dated June 22, 2026

EXHIBIT 15

Sheppard

June 22, 2026

+1.858.720.7408
khoush@sheppard.com

File Number: 83HX-443167

**VIA E-MAIL- pscheiferstein@swlaw.com**

Paloma Scheiferstein
Snell & Wilmer L.L.P.
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135

**Re: <u>AAA Case No. 01-26-0003-6759 – Hobo Hot Springs Self Storage, LLC and Carson Valley/Tahoe Self Storage, LLC v. Washoe Development Corporation</u>**

**Subj: Statement of Jurisdictional and Arbitrability Objections; Request to Hold Arbitration in Abeyance; Reservation of All Rights and Defenses**

Dear Ms. Scheiferstein:

This firm represents Washoe Development Corporation ("WDC") in connection with the above-referenced arbitration demand filed with the American Arbitration Association ("AAA") on June 5, 2026 (the "Demand") by Hobo Hot Springs Self Storage, LLC and Carson Valley/Tahoe Self Storage, LLC (collectively, "Claimants"). By way of background, WDC is a federally chartered tribal corporation organized under its corporate charter federally approved by the Secretary of the Interior pursuant to 25 U.S.C. § 5124 (formerly 25 U.S.C. § 477), and wholly owned by the Washoe Tribe of Nevada and California ("Tribe"), a federally recognized Indian tribe.

We write to set forth WDC's objections to the jurisdiction of the AAA and the arbitrability of this dispute. These objections are not exhaustive, but each is sufficient in and of itself to necessitate denial of Claimants' demand that their claims be arbitrated.

Nothing in this letter constitutes consent to the jurisdiction of the AAA, submission to arbitration, or a waiver (express or implied) of WDC's sovereign immunity, its objections to arbitrability, or any other right or defense. WDC expressly reserves all rights and defenses, including the right to assert counterclaims in any forum of competent jurisdiction.

## I. THRESHOLD ISSUES OF ARBITRABILITY ARE ISSUES FOR JUDICIAL DETERMINATION, NOT THE AAA

At the outset, the question of arbitrability "is undeniably an issue for judicial determination." *AT&T Techs., Inc. v. Commc'ns Workers of Am., 47*5 U.S. 643, 649 (1986); *see Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1268 (9th Cir. 2006). Moreover, "courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938,

944 (1995). Indeed, the Ninth Circuit has confirmed that a court must resolve any challenge that an agreement to arbitrate was never formed — and must resolve any challenge directed specifically to the enforceability of a delegation clause — before compelling arbitration of any remaining gateway issues, even where a delegation clause is present. *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022).

A court should determine in the first instance whether the claims asserted by Claimants are arbitrable because here, there is no agreement by WDC to arbitrate this or any dispute with Claimants and there is no "clear and unmistakable evidence" that the parties to the Ground Leases intended to delegate the decision of arbitrability to the AAA.

**A. There Is No Existing Arbitration Agreement With WDC**

It is axiomatic that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. *In re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986)). Here, there can be no agreement by WDC to arbitrate any dispute with either Claimant where WDC is not a signatory to either Ground Lease No. B-206 or Ground Lease No. B-224. The 2022 Tribal Council Resolution that appointed WDC as successor to WDE expressly limited WDC's role to "overseeing" Lease contracts B-206 and B-224. It did not constitute a formal assignment or assumption of all contractual obligations under those leases, it did not specifically reference the arbitration clauses in Sections 17.01 and 18.01, and it did not contain any language by which WDC agreed to be bound by the agreement to arbitrate. A party that has never executed or formally assumed an arbitration agreement cannot be compelled to arbitrate. The demands here are directed solely at WDC — an entity that is a legal stranger to every instrument in which the arbitration clauses were originally contained and to which those clauses were originally agreed.

Further underscoring this point, WDC was created as a separate, independent federal corporation of the Tribe. Nothing in the Federal Charter of Incorporation Issued by the United States of America Department of Interior Bureau of Indian Affairs to the Washoe Tribe of Nevada and California for the Washoe Development Corporation, a Federal Corporation, chartered by the Tribe on May 16, 2006, which charter was approved by the Secretary of the Interior on November 29, 2006, and ratified by the Tribe on October 2, 2014 (the "WDC Charter") designates WDC as a successor to WDE, or as having assumed the obligations and liabilities of WDE. WDC's independent corporate existence — with its own distinct WDC Charter, its own governance structure, and its own separate legal identity — is incompatible with any inference that WDC automatically stepped into WDE's contractual shoes, including WDE's agreement to arbitrate under Sections 17.01 and 18.01 of the Ground Leases. Where a tribal entity's own governing charter does not designate it as a successor to a prior entity, there is no legal basis for imposing the prior entity's contractual obligations — particularly an agreement to arbitrate — upon it.

**B. An Arbitration Agreement Was Never Formed Because The Parties Lacked Mutual Assent**

An independent and threshold basis for the conclusion that no valid agreement to arbitrate was ever formed is the absence of any applicable body of law under which mutual assent to the arbitration clause could be evaluated. It is well established that "arbitration is a matter of contract," and contracts require mutual assent. Courts apply "ordinary state-law

principles that govern the formation of contracts" to determine "whether the parties agreed to arbitrate a certain matter (including arbitrability)." *First Options of Chicago, Inc*, 514 U.S. at 944. Here, however, no body of law — state, federal, or tribal — supplies the rules of contract formation necessary to evaluate whether mutual assent to the arbitration clauses in Sections 17.01 and 18.01 was ever achieved.

First, state law does not apply. The Ground Leases lease land that is titled in the name of the United States for the benefit of the Washoe Tribe of Nevada and California ("Washoe Tribal Trust Land") and the Ground Leases were entered into within the Tribe's territorial jurisdiction. State law has no force over contracts involving tribal entities absent explicit tribal consent or a congressional mandate making state law applicable. *Bryan v. Itasca Cnty.*, 426 U.S. 373, 376 (1976). The Ground Leases contain no governing law clause designating Nevada or any other state's law, and there is no congressional mandate making Nevada contract law applicable to ground leases of Washoe Tribal Trust Land.

Second, federal law does not supply the gap. The FAA "does not itself provide a substantive law governing the formation or general interpretation of contracts." *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*, 104 F.4th 978, 991 (7th Cir. 2024). The FAA presupposes an applicable body of law to evaluate formation — it does not itself constitute one.

Third, there is no applicable tribal law on contract formation. The Washoe Tribe's Sovereign Immunity Code, Title 33, addresses sovereign immunity and the conditions for waiving it — it does not contain general principles of contract formation, mutual assent, or offer and acceptance. The WDC Charter similarly addresses the internal governance and authority requirements for WDC's transactions but supplies no tribal common law of contracts. Unlike the situation in which a tribe has enacted a tribal contract code or ordinance specifically addressing contract formation, no such body of law governs here.

The consequence of this tripartite absence is that there is no legal framework under which a court — or an arbitrator — can determine whether the arbitration clauses in Sections 17.01 and 18.01 were validly formed through mutual assent. Where "federal law does not provide underlying principles of contract formation and there was no [applicable] law for an arbitrator to apply when" the parties signed their contracts, a court cannot " 'ascertain what the parties have agreed to do' in committing their future disputes to arbitration," and therefore "cannot have mutually assented to the delegation or arbitration terms." *Harris v. W6LS, Inc.,* No. 24-2056, 2026 WL 1641195, at *5 (7th Cir. June 5, 2026) (internal citation omitted). The parties cannot be said to have had a "meeting of the minds" as to an essential element of their bargain to arbitrate where there is no law to govern that process. *Id*.

This argument is directed specifically at the formation of the arbitration clause as a severable agreement — not at the Ground Leases as a whole. The arbitration and delegation provisions are "separate agreements," and "a formation challenge to either does not presume the invalidity of the container contract." *Harris*, 2026 WL 1641195, at *6. The Ground Leases may otherwise be operative instruments — but the arbitration clauses within them fail for want of mutual assent because no body of law existed, or exists, to give content to what the parties were agreeing to when they purported to commit their future disputes to arbitration. Contract formation is a clear prerequisite for delegation and arbitration, and "even the most sweeping delegation cannot send the contract-formation issue to the arbitrator." *Id.* at n.3 (quoting *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022)).

### C. No Delegation to Arbitrators to Determine Arbitrability

Further, even if there were a valid agreement to arbitrate by the parties, the reference to the rules of the AAA in each Ground Lease is insufficient to satisfy the high threshold necessary to establish clear and unmistakable evidence that the parties to the Ground Leases intended to delegate to the arbitration panel the ability to decide arbitrability. This is because Section 16.08 of Ground Lease B-224 and Section 17.08 of Ground Lease B-206 expressly contemplate that a court, not an arbitration tribunal, will determine whether "any term, covenant, condition or provision of this Lease is . . . invalid, void, or unenforceable." These express provisions delegating enforceability of the leases (including the arbitration provisions therein) to the determination of a court undermines and supersedes any AAA rule regarding delegation of threshold issues of arbitrability to the arbitration panel. *See Guidiville Rancheria of Cal. v. Ginsburg*, No. 26-CV-01578-AGT, 2026 WL 1229581, at *3 (N.D. Cal. May 5, 2026); *Armor All/STP Prods. Co. v. TSI Prods., Inc.*, 337 F. Supp. 3d 156, 164 (D. Conn. 2018). The Ninth Circuit has made clear that this step-by-step framework requires courts to resolve challenges to the delegation clause specifically before allowing an arbitrator to decide any arbitrability issue. *Caremark, LLC*, 43 F.4th at 1030.

The Ninth Circuit's decision in *Caremark, LLC v. Choctaw Nation*, 104 F.4th 81 (9th Cir. 2024), confirms that a clear and unmistakable delegation of arbitrability in the sovereign immunity context requires more than a generic reference to AAA rules. In *Choctaw Nation*, the court found delegation only because the arbitration provision contained — in addition to AAA rules incorporation — an express clause granting arbitrators "exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason." *Id.* at 90. No such express delegation clause exists anywhere in Section 17.01 of Lease B-224 or Section 18.01 of Lease B-206. Moreover, unlike the *Choctaw Nation* contract, which specifically named the AAA Commercial Rules by name, Sections 17.01 and 18.01 reference only "the rules of the American Arbitration Association" generically, without identifying which AAA ruleset applies — a weaker basis for any incorporation argument. The absence of an express delegation clause of the type present in *Choctaw Nation*, combined with the express court-forum provisions and jurisdictional limitation language discussed above, conclusively defeats any claim of clear and unmistakable delegation here.

## II. THE AAA LACKS JURISDICTION ON THE GROUND OF TRIBAL SOVEREIGN IMMUNITY

WDC objects to the AAA's jurisdiction on the ground of tribal sovereign immunity. As set forth in its federally approved charter and as an arm of the Tribe, WDC possesses the full sovereign immunity of the Tribe.

Article IV(B) of the WDC Charter provides that "[t]he Corporation shall have the same tax status and immunities under federal and state law as the Tribe." Article IV(C) provides that "[t]he Corporation shall have the same rights, privileges and immunities with respect to Federal, state and local law as the Tribe." Article XVI(A) provides unequivocally that "[t]he Corporation is an instrumentality of the Tribe and is entitled to all of the privileges and immunities of the Tribe, except as provided in this Article XVI."

WDC has not waived its sovereign immunity by virtue of the arbitration provision within the Ground Leases described in the Demand or in any instrument, document or authorizing resolution of WDC or the Tribe. As a result, the arbitration panel lacks any jurisdiction to hear any claims against WDC.

**A. WDC Has Tribal Sovereign Immunity**

Indian tribes have immunity from unconsented suit because of their status as sovereign governments. *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)). Tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo*, 436 U.S. at 58. The Supreme Court has explained that this immunity is "a necessary corollary to Indian sovereignty and self-governance." *Bay Mills*, 572 U.S. at 788 (citing *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.*, 476 U.S. 877, 890 (1986)). Tribal immunity extends to entities of the tribe, including those engaged in economic activities. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 62*9 F.3d 1173, 1183 (10th Cir. 2010); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046–47 (9th Cir. 2006); *Cook v. AVI Casino Enters., Inc.,* 548 F.3d 718, 725–26 (9th Cir. 2008). Accordingly, WDC is entitled to tribal sovereign immunity unless it has expressly waived its immunity.

**B. There Is No Clear and Express Waiver of Sovereign Immunity**

A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58. Waivers of immunity are to be construed strictly and narrowly in favor of the sovereign. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675-86 (1999); *Ramey Constr. Co. v. Apache Tribe of Mescalero Reservation*, 673 F.2d 315, 320 (10th Cir. 1982); *Tongol v. Donovan*, 762 F.2d 727, 730 (9th Cir. 1985). There is a "strong presumption" against finding a waiver. *Demontiney v. United States*, 255 F.3d 801, 811 (9th Cir. 2001); *Pan Am Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416, 419 (9th Cir. 1989). Here, WDC has not expressly waived its sovereign immunity with respect to the claims asserted by Claimants by virtue of the arbitration provisions in the Ground Leases or by any other instrument or document. In fact, WDC is not a party to any contractual relationship with Claimants at all. The Ground Leases were entered into between Claimants and the Washoe Development Enterprise ("WDE"), an enterprise of the Tribe that was dissolved in 2003. And, the 2015 Amendments to the Ground Leases were entered into between Claimants and the Tribe. Such Ground Leases and 2015 Amendments were never legally assigned to or assumed by WDC.

**C. There Is No Waiver of Sovereign Immunity under Tribal Law**

For a waiver of sovereign immunity to be effective, it must be executed in compliance with the Tribe's laws and by an agent authorized to waive immunity. *See Memphis Biofuels, L.L.C. v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 922 (6th Cir. 2009); *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1287–88 (11th Cir. 2001); *United States v. U.S. Fid. & Guar. Co., 30*9 U.S. 506, 513 (1940); *World Touch Gaming, Inc. v. Massena Mgmt., LLC*, 117 F. Supp. 2d 271, 275 (N.D.N.Y. 2000).

The Tribe enacted the Washoe Sovereign Immunity Code, Title 33 of the Washoe Tribe Law & Order Code to specifically confirm that its Tribal Entities possess the sovereign immunity

of the Tribe and address how such a Tribal Entity can waive its sovereign immunity. The Tribe's Sovereign Immunity Code provides that a Tribal Entity "possesses all of the privileges, protections, and immunities of the Tribe, including but not limited to . . . sovereign immunity from lawsuit, action, claim, controversy or process, in any state, federal or Tribal court, forum or tribunal." "Tribal Entity" is defined as "any Tribal branch, office, department, agency, commission, utility, authority, instrumentality, enterprise, corporation, partnership, limited liability company, or similar corporate entity (whether chartered under Tribal, state or federal law), or other entity of the Tribe." WDC, as a federal corporation chartered by and for the Tribe, falls squarely within this definition and is therefore entitled to the full protections of Title 33.

The sovereign immunity of a Tribal Entity, including WDC, may only be waived by (a) express resolution of the Tribal Council or (b) in accordance with the Tribal Entity's Charter approved by the Tribal Council.

Additionally, WDC's Charter authorizes WDC to waive "any defense of sovereign immunity from suit" arising from any particular agreement, and to "consent to alternative dispute resolution mechanisms such as arbitration or mediation or to suit in tribal, state and/or federal court." However, the WDC Charter provides that any such waiver shall be in the form of a resolution duly adopted by the Board of Directors and that such resolution "shall identify the party or parties for whose benefit the waiver is granted, the transaction or transactions and the claims or classes of claim for which the waiver is granted, the property of the Corporation which may be subject to execution to satisfy any judgment which may be entered in the claim, and shall identify the court or courts in which suit against the Corporation may be brought."[1]

There is no such resolution of WDC (or the Tribe or WDE) authorizing any waiver of sovereign immunity or consent to arbitration in connection with the Ground Leases.

**D. The Arbitration Provisions in the Ground Leases are Insufficient to Clearly Waive Sovereign Immunity**

The arbitration provisions within the Ground Leases are not a clear or express waiver of sovereign immunity of WDC under the standards set forth in *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411 (2001). This is because, in addition to WDC not being a party to the Ground Leases, the Ground Leases lack a choice of law or governing law provision, fail to identify any specific court with jurisdiction to confirm arbitration awards or judgments, and were not authorized or approved in accordance with the requirements of tribal law. *See Churchill Fin. Mgmt. Corp. v. ClearNexus, Inc.*, 341 Ga. App. 798, 804 (2017); *Lobo Gaming, Inc. v. Pit River Tribe of Cal.*, No. C037661, 2002 WL 922136, at *4 (Cal. Ct. App. May 7, 2002); *Miller v. Wright*, 705 F.3d 919, 926 (9th Cir. 2013); *see also Caremark, LLC v. Choctaw Nation*, 104 F.4th at 90-92, n. 8 (regarding the significance of tribal law in analyzing whether there has been a valid waiver of sovereign immunity).

---

[1] Similarly, WDE's (the party to the original Ground Leases) Charter required (a) Board and Tribal Council approval by written resolution, (b) the terms set forth in a written instrument approved by both, (c) delineation of the assets subject to the waiver, and (d) specification that remaining assets are not subject to the waiver. There is no evidence that any of these four conditions were ever satisfied with respect to the Ground Leases' arbitration provisions.

Critically, the Supreme Court in *C & L Enterprises* expressly conditioned its holding on the signatory to the arbitration clause having had authority under tribal law to bind the tribe to a waiver of sovereign immunity. *See id.* at 419 n.6. Here, as set forth above, neither WDE (the signatory to the original Ground Leases) nor the Tribal Chairman (the signatory to the 2015 Amendments) had authority under tribal law to unilaterally waive sovereign immunity through the execution of a commercial lease. WDE's own Charter required joint Board and Tribal Council written resolutions specifically authorizing a limited waiver, identifying the assets subject to the waiver, and specifying that remaining assets were not subject — conditions that were never met. The Tribal Chairman's signature on the 2015 Amendments likewise does not constitute the express Tribal Council resolution that Title 33 requires for any waiver on a contract of this value. The *C & L Enterprises* waiver-by-arbitration-clause principle therefore does not apply.

## III. THE AAA LACKS JURISDICTION BECAUSE THE CLAIMS ARE NOT RIPE

### A. No Anticipatory Repudiation — WDC Has Not Made a Clear, Positive, Unequivocal, and Absolute Refusal to Perform

The Demand alleges that WDC "expressly and unequivocally" communicated an intent not to honor the Section 2.04 purchase obligation and that this constitutes anticipatory repudiation. This characterization is incorrect.

"An express repudiation occurs when one party demonstrates 'a definite unequivocal and absolute intent not to perform a substantial portion of the contract.'" *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1250 (D. Nev. 2016), *amended in part*, No. 3:13-CV-0445-LRH-VPC, 2016 WL 11722898 (D. Nev. Nov. 1, 2016) (citing *Kahle v. Kostiner*, 85 Nev. 355 (1969)); *see also Stratosphere Litig., LLC. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1147 (9th Cir.2002) (holding that an "[a]nticipatory repudiation occurs, when a party through conduct or language, makes a clear, positive and unequivocal declaration of an intent not to perform.").

WDC's April 1, 2026 letter[2] does not meet this standard. While the April 1, 2026 letter addressed WDC's preliminary review of the Section 2.04 purchase obligation and raised questions regarding the validity of the Section 2.03 appraisal process, it contained multiple express qualifications that preclude it from constituting the "clear, positive, and unequivocal" declaration required for anticipatory repudiation as a matter of law:

- The letter expressly characterized WDC's review of the lease obligations as "preliminary."
- The letter expressly disclaimed finality: "nothing herein should be construed as WDC's final or complete statement" of its position.
- The letter reserved all rights.

---

[2] Moreover, the April 1, 2026 letter was an offer of compromise and therefore is not admissible to prove liability, including any anticipatory breach. *See* Fed. R. Evid. 408.

A conditional, qualified, or tentative expression of concern about future performance — particularly one that expressly disclaims finality — does not constitute the "clear, positive, and unequivocal" standard required for express anticipatory repudiation as a matter of law.

WDC's actions do not even meet standard for an implied anticipatory repudiation: "An implied repudiation occurs when one party acts in such a manner as to make its future performance under the contract impossible." *Shaw*, 201 F. Supp. 3d at 1250 *citing Covington Bros. v. Valley Plastering, Inc.*, 93 Nev. 355 (1977). Nothing in WDC's April 1, 2026 letter makes future performance impossible.

**B. The Alleged Purchase Option Under Section 2.04 Is Not Yet Triggered**

The Ground Leases purport to establish a mandatory purchase obligation only "upon expiration" of the lease, with the purchase price to be determined consistent with Section 2.03. According to the Demand, the Ground Leases do not expire until October 5, 2026.[3] Because, according to Claimants themselves, the Ground Leases have not yet expired, no purchase obligation currently exists. There is nothing to breach — anticipatorily or otherwise.

**C. The Section 2.03 Appraisal Process Was Never Validly Initiated**

Section 2.03[4] requires lessor's notice of intent to consider purchasing no earlier than 180 days and no later than 90 days before the expiration of the Ground Leases.[5] WDC's August 19, 2025 letter was sent approximately 413 days before the alleged October 5, 2026 expiration date of the Ground Leases — well outside the valid 180-day window.

Because WDC's notice was premature, the appraisal process was never validly initiated. As a result:

- The appraisals conducted are not the contractually authorized Section 2.03 appraisals;
- The "deemed adoption" consequence — by which failure to appoint an appraiser within 30 days "is deemed equivalent to appointing the appraiser appointed by the

---

[3] WDC has serious concerns about whether the 2015 Amendments, which purported to extend the terms of the Ground Leases, are valid and therefore whether the Ground Leases are even in effect at this time. The effectiveness of the 2015 Amendments was expressly conditioned upon BIA approval. There is no evidence that the BIA ever approved the 2015 Amendments.

[4] Notably, the renewal option deadlines under Section 2.02 of the Ground Leases do not depend on, and indeed are entirely separate from, the optional and mandatory purchase obligations set forth in Sections 2.03 and 2.04. In other words, the Ground Leases do not contemplate that the parties will have started or even completed the appraisal process before Claimants decide whether to exercise their renewal option under Section 2.02.

[5] Assuming *arguendo* the Section 2.03 appraisal report timing mechanism applies to the Section 2.04 mandatory purchase obligation (which is ambiguous, at best), this means that lessor must provide notice of its intent to consider purchasing Claimants' business no earlier than April 8, 2026 and no later than July 7, 2026. That time period has not yet expired – accordingly, Claimants' Demand is unquestionably premature.

other party" — presupposes a valid Section 2.03 process, which was never started; and

- The Demand's contention that WDC is deemed to have adopted Self Storage's $34,300,000 appraisal fails.[6]

**D. The Appraisal-Sharing Obligation Has Not Been Triggered**

The lessor's duty to provide "complete copies" of appraisal reports is expressly conditioned on "completion of the appraisals" and "submission to Lessor of comprehensive written reports." WDC's appraisal is not yet in final form. No sharing obligation has arisen.

**E. Section 18.01 / 17.01's Mandatory 30-Day Pre-Arbitration Period Was Not Satisfied**

Section 18.01 of Lease B-206 and Section 17.01 of Lease B-224 require that a dispute remain unresolved for thirty (30) days after a party gives notice of its "desire to arbitrate" before the matter "shall be settled by arbitration." This is a threshold procedural condition precedent. As set forth above at Sections III.A-D, there is no "dispute" at all, let alone one that has remained unresolved for 30 days. Further, Claimants never provided the requisite notice of "desire to arbitrate." The April 17, 2026 letter from Bernard Law Office merely vaguely stated that Claimants' "litigation counsel will act accordingly" and reminded WDC of the arbitration provision in the Ground Leases. That does not constitute the contractually required notice of an intent to initiate arbitration proceedings.

Claimants filed the Demand on June 5, 2026, without satisfying this mandatory waiting period. The AAA has no authority to proceed until this condition precedent has been satisfied.

## IV. THE AAA LACKS JURISDICTION TO GRANT THE ESTOPPEL RELIEF CLAIMANTS SEEK

The arbitration provisions in the Ground Leases expressly state "the arbitrators shall have no power to modify any of the provisions" of the Ground Leases and that "their jurisdiction is limited accordingly."

Claimants' alternative estoppel claim seeks a declaration that WDC is estopped from enforcing the Section 2.02 option notice deadlines, and that Self Storage may exercise the extension option for a "reasonable period" after WDC provides appraisals.

An order declaring that an option deadline set forth in a contract does not apply — and extending the deadline to exercise that option — is a modification of a provision in the Ground

---

[6] Claimants' assertion that WDC's alleged failure to provide an appraisal report constitutes adoption of Claimants' appraisal report is incorrect as a matter of contract. Section 2.03(b) of each Lease provides only that "[t]he failure of either the Lessor or Lessee to appoint an appraiser within the time allowed shall be deemed equivalent to appointing the appraiser appointed by the other party." That provision is expressly limited to failure to appoint an appraiser — it says nothing about appraisal reports. In any event, the deemed-equivalent clause is inapplicable here because WDC has appointed an appraiser.

Leases. This is precisely the type of relief that the Ground Leases prohibit. The AAA is expressly without authority to grant the alternative estoppel relief sought, regardless of the merits.

## V. RENO, NEVADA IS THE PROPER ARBITRATION HEARING LOCALE

Without waiving any of the above objections, WDC further objects to Las Vegas as the proposed hearing locale. The subject properties are geographically located within Indian Hills, Douglas County, Nevada — property squarely situated in northern Nevada, in and around the Reno metropolitan area. The witnesses with material knowledge of this controversy are located in or near Reno, and requiring them to travel to Las Vegas would impose unnecessary burden and expense without any corresponding benefit to the efficiency or fairness of the proceedings. There is no substantive connection to Las Vegas beyond the location of Claimants' counsel. Reno is the only logical and appropriate venue for any proceedings should the arbitration proceedings move forward.

## VI. EXPRESS RESERVATION OF ALL RIGHTS AND DEFENSES

WDC denies the allegations of Claimants' claims on the merits and reserves its right to assert any and all applicable defenses, including its sovereign immunity, and to file counterclaims if the matter is subject to arbitration. Specifically, WDC expressly reserves all rights, remedies, claims, and defenses available to it in any forum, whether at law, in equity, or otherwise, including without limitation:

1. WDC's sovereign immunity as a tribal instrumentality;
2. WDC's objection to the jurisdiction of the AAA and any arbitral panel;
3. WDC's position that it is not a party to any arbitration agreement;
4. WDC's objection to the venue being in Las Vegas;
5. All substantive defenses to the claims asserted in the Demand;
6. The right to assert counterclaims against Claimants in any forum of competent jurisdiction, including but not limited to claims for damages, declaratory relief, and any other relief to which WDC may be entitled; and
7. All procedural objections, including but not limited to ripeness, failure to satisfy conditions precedent, and the arbitrators' lack of authority to grant the relief sought.

Nothing in this letter, and no communication or action by WDC or its counsel in connection with the Demand or the AAA proceedings, shall be construed as (a) consent to the jurisdiction of the AAA or any arbitral panel, (b) a waiver — express or implied — of WDC's sovereign immunity, (c) submission to arbitration, (d) an admission of any fact or legal conclusion, or (e) a waiver or relinquishment of any right, defense, claim, or counterclaim.

These objections are not exhaustive, but each is sufficient in and of itself to establish that the AAA cannot proceed with arbitration.

## VII. REQUEST TO HOLD PROCEEDINGS IN ABEYANCE; NOTICE OF INTENT TO SEEK EMERGENCY RELIEF

For all of the foregoing reasons, WDC contends that the threshold issues of arbitrability, sovereign immunity, and jurisdiction must be resolved by a court of competent jurisdiction before any arbitral proceedings may go forward. These are quintessential "gateway" issues reserved for judicial determination. *AT&T Techs. v. Commc'ns Workers of Am.,* 475 U.S. at 649; *Nagrampa*, 469 F.3d at 1268; *First Options of Chi.*, 514 U.S. at 943-944; *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-300 (2010).

WDC respectfully requests that Claimants' counsel agree to hold the AAA proceedings in abeyance — with no further administrative action, scheduling, or substantive proceedings — pending a determination by the United States District Court for the District of Nevada on the threshold issues of arbitrability, sovereign immunity, and jurisdiction.

WDC intends to file a declaratory relief action and seek a preliminary injunction from the court enjoining the AAA proceedings pending its resolution of these threshold issues. If Claimants decline to agree to hold the AAA proceedings in abeyance, WDC will be left with no choice but to seek a temporary restraining order ("TRO") from the federal court to prevent the arbitration from proceeding in violation of WDC's sovereign immunity and in the absence of a valid agreement to arbitrate.

## VIII. CONCLUSION

WDC's objections to the AAA's jurisdiction and the arbitrability of the claims set forth in the Demand are substantial and well-founded. Sovereign immunity is a threshold jurisdictional bar, not a defense to be adjudicated on the merits. Moreover, the absence of any valid arbitration agreement binding WDC, the ripeness deficiencies in the claims asserted, the failure to satisfy mandatory pre-arbitration conditions, and the arbitrators' express lack of authority to grant the relief sought all independently require that these proceedings be stayed or dismissed.

We trust that Claimants' counsel will agree that these threshold issues are properly resolved by a federal court and will consent to hold the AAA proceedings in abeyance. We remain available to discuss the terms of an appropriate stipulation.

Respectfully,

Kristin P. Housh
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:4937-9212-6901

cc: Jennifer C. Morrison, Director of ADR Services
Alex Fugazzi, Esq.
Ed J. Hermes, Esq.
Christine Swanick, Esq.
Paul Tyson, Esq.